[Cite as *J.S. v. L.S.*, 2022-Ohio-2485.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| [J.S.], | : | |
| Petitioner-Appellee, | : | No. 20AP-571 |
| | | (C.P.C. No. 19DV-806) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| [L.S.], | : | |
| Respondent-Appellant. | : | |

D E C I S I O N

Rendered on July 19, 2022

**On brief:** *Grossman Law Offices, LLC*, and *John H. Cousins IV*, for appellee. **Argued:** John H. Cousins IV

**On brief:** *Trolinger Law Offices, LLC,* and *Christopher L. Trolinger*, for appellant. **Argued**: Christopher L. Trolinger

APPEAL from the Franklin County Court of Common Pleas,
Division of Domestic Relations and Juvenile Branch

MENTEL, J.

{¶ 1} Respondent-appellant, [L.S.], appeals from the December 14, 2020 order of the Franklin County Court of Common Pleas, Domestic Relations Division, granting the petition for a domestic violence civil protection order of petitioner-appellee, [J.S.].

{¶ 2} For the reasons that follow, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 3} On May 1, 2019, appellee filed a petition for a domestic violence civil protection order against her former boyfriend, appellant. The petition identified two minor children as family members to be protected by the order. According to the addendum included in the petition, appellant had threatened appellee over the telephone and text

message stating that he was going to "burn" her, and she would "not have a pretty face much longer." (Addendum, attached to Petition for Domestic Violence Protection Order.) Appellee also alleged that appellant had given her minor son a black eye, visited her children's daycare without her permission, and left unsolicited items on her doorstep. According to appellee, appellant also sent her a video of his attempted suicide. The trial court granted appellee's ex parte emergency order and the case was set for a full hearing.

{¶ 4} This matter was first heard on June 3, 2019. The trial court granted appellee's petition for domestic violence civil protection order as to the protected persons and added appellee's newborn child to the order who was born after the petition was filed but before the full hearing. On June 25, 2019, appellant filed a timely appeal. On March 26, 2020, this court reversed and remanded the case concluding that the trial court had failed to afford appellant a "full hearing" within the meaning of R.C. 3113.31. *J.S. v. L.S.*, 10th Dist. No. 19AP-400, 2020-Ohio-1135 ("*J.S. I*"). Specifically, the trial court failed to provide a "full hearing" when "it considered evidence submitted by J.S. without allowing L.S. to review the evidence and in conducting independent factual research without allowing L.S. to respond." *Id*. at ¶ 25. The case was reheard on October 26, 2020. The following evidence was adduced at the hearing.

{¶ 5} Appellee and appellant dated on and off in 2018. (Oct. 26, 2020 Tr. at 7.) Appellee testified that when she first started dating appellant, he "grabbed [her] around [the] neck and held [her] to the bed and when [she] passed out, he choked [her], he said he was sorry that he took it too far." (Tr. at 10.) According to appellee, in August 2018, she broke up with appellant after he gave her two-year-old son a black eye. Appellee stated that appellant admitted to hitting her son purportedly because the child was acting up in the store. Appellee did not call the police about the incident out of fear of retaliation. (Tr. at 7, 11.) According to appellee, appellant threatened her over the telephone, text message, and in person. (Tr. at 13.) Appellee told appellant for months that she was afraid of him and did not want any contact with him going forward. (Tr. at 8.) Appellant sent her messages that she was "just a whore, you are not getting away from me, no matter where you go, I will be there." (Tr. at 8.) Appellee testified, "[appellant] told me one day that he was going to burn me and I wasn't going to be a pretty face much longer after showing up to my house screaming at me from the road." (Tr. at 9.) According to appellee, in April 2018, appellant

also showed up at her children's daycare, grabbed her by the arm, and would not let go until she agreed to talk to him. (Tr. at 9-10.) Appellant also showed up a week or so later at her place of work. (Tr. at 9.) Appellee testified that appellant threatened to come to the house and take her son's belongings. (Tr. at 9.) In August 2018, appellant followed appellee back to her vehicle at the Sweet Corn Festival calling her names and telling her that she was not going to leave. (Tr. at 13.) At that point, appellee agreed to give appellant a ride home. According to appellee, appellant became very upset and refused to leave her vehicle. Ultimately, appellant exited the vehicle without further incident. (Tr. at 13.) Appellee testified that she believed appellant was a violent person after learning he had previously shot himself over a custody matter. (Tr. at 11.) Appellee testified that appellant owns a gun as he had it at one point in his bedroom, and he later put a gun in his truck allegedly because people from work were following him. (Tr. at 13-14.)

{¶ 6} In April 2019, appellant drove by appellee's home and yelled that she was not going to be a pretty face much longer. (Tr. at 11.) Appellee interpreted this to mean, based on the prior comments, he was going to burn her face. "I don't know how to feel other than you were going to seriously hurt me." (Tr. at 11.) Appellee testified to several text messages she exchanged with appellant. Appellee read a message that appellant would see her at the hospital, which she took to mean he was going to hurt her. (Tr. at 16.) Appellee testified to a picture appellant sent her of a jump rope tied to the banister with the message, "if I want to keep not taking him seriously, he hoped it was on my conscious forever." (Tr. at 18.) Appellee stated that appellant would regularly make threats that he would harm himself and these messages made her "afraid that if he did -- if he did follow through with it, what it would mean to his girls and how I would be responsible, and that if he didn't follow through and I didn't contact him, that he would come after me and harm me because I didn't respond in the way that he felt was appropriate." (Tr. at 17-18.) Appellant had sent appellee a video of him attempting to hang himself and a message that said, "I'm serious [appellee], I will be dead by morning." (Tr. at 17.) Appellee stated the text message was a separate threat from the video. (Tr. at 17.) The video was played for the court. Appellee testified that approximately 18 seconds into the video, appellant is standing with a rope around his neck. At or around 48 seconds into the video, appellant's daughter walked out of her room when the appellant exclaimed "shit." (Tr. at 21.) Appellee testified that she

watched the video before the text message and believed appellant was dead. (Tr. at 19.) Appellee stated that she experienced mental distress from the video and reading the text messages. (Tr. at 21.) Appellee testified that she later received a text message from appellant that stated, "I would be dead right now if [appellant's daughter] didn't wake up." (Tr. at 22.) Appellant also sent a message to appellee that the police cannot hold him forever, appellee took it to mean "that [appellant] would come harm [her]." (Tr. at 23.)

{¶ 7} Appellee testified she could not get out of bed and could not focus or live her life without thinking appellant was going to "make good on the threat that he was going to burn me." (Tr. at 10.) Appellee started seeing a psychiatrist and taking medication because she could not sleep for weeks at a time. Appellee testified that she now takes anxiety and nausea medicine. (Tr. at 23.) "I would wait out by the front door waiting for him to show up to hurt me or my kids." (Tr. at 23.) Appellee changed jobs out of fear that appellant would hurt her at work. (Tr. at 23.) According to appellee, she urinated in her pants when appellant walked by her during a court hearing. (Tr. at 23-24.) Appellee testified that she is fearful of appellant causing her imminent serious bodily harm. (Tr. at 24.)

{¶ 8} On cross-examination, appellee was asked about her previous petitions for a domestic violence protection order against her ex-husband, Andrew Cunningham, and Zach Riehl, the father of one of her children. (Tr. at 29, 32.) Appellee stated that neither case went to a hearing. Appellee testified that she had previously informed appellant that he was not the father of her newborn child. (Tr. at 36.) According to appellee, appellant said he was going to burn her on multiple occasions but the one instance that stood out was in the street. (Tr. at 39.) While appellee acknowledged that there is more than one meaning to someone saying they are going to "burn you," she testified, "I took it like he was going to burn me; and when he followed it up with I wasn't going to be a pretty face, I felt like he was going to catch me on fire and burn me." (Tr. at 39.) Appellee stated that appellant sent text messages that "he was going to burn me, he was going to come to my work, he was going to contact my friends and family, which he had already had done. And then he would say it was all in the name of protecting his children because he believed I would reach out and get them help, and he didn't want them taken away from him." (Tr. at 42-43.) Appellee conceded there were no text messages about appellant "burning" her before the court.

(Tr. at 43.) Appellee explained that she changed phones, and it was difficult to go through a year's worth of messages.

{¶ 9} Appellee testified that appellant gave her son a black eye in 2018. Appellee acknowledged she did not witness appellant hit her son. Appellee initially heard about it through appellant's daughter but testified appellant later admitted to the incident. (Tr. at 49.) Appellee could not initially identify a direct threat in Exhibits 1 or 2 but stated that a video of appellant trying to kill himself "made [her] feel like there was a threat." (Tr. at 51-52.) Appellee conceded that she continued to text appellant after the incident. "I did. I wouldn't want anybody to die." (Tr. at 52.) Appellee acknowledged that she continued to text appellant up until she filed the civil protection order. Appellee testified that, two days before she filed the protection order, she told appellant if he did not stop texting her, she would file a protection order. (Tr. at 52-53.)

{¶ 10} On redirect examination, appellee testified that she believed appellant's text message that law enforcement "can't keep me forever" was a threat. Appellee stated that appellant's text messages that he would "see [her] at the hospital," and she was a "white trash whore" were threats. (Ex. 1 at 8.) Appellee testified that she wanted her children included as protected parties in the order. (Tr. at 66.) Appellee explained she interpreted the question regarding her prior petitions for protection orders as whether she had filed a standalone petition, which did not involve custody or part of her divorce. (Tr. at 66.)

{¶ 11} Appellant was the only other witness to testify at the hearing. Appellant has sole custody of two children unrelated to this case. (Tr. at 72.) Appellant testified that he started dating appellee in 2018. Appellant denied ever having a physical altercation with appellee. According to appellant, the text message about the hospital concerned his desire to be at the hospital for the birth of appellee's youngest child. Appellant stated his comment about appellee not being a pretty face anymore was referring "to aging, the way she was living her life, the lives she was destroying, anyone that had a possible child with her, just the evil, pure evil of the things she does is what I was referring to." (Tr. at 77.)

{¶ 12} Appellant admitted to attempting suicide 11-12 years ago by shooting himself in the chest. (Tr. at 78.) Appellant testified that he engaged in inpatient treatment and has been in counseling. As for the suicide video, appellant testified that appellee "had previously been telling me it was my kid, and then she told me the kid passed away, and

then they found a heartbeat, and then it was not my kid." (Tr. at 79.) The video "was a way of trying to get her to stop the roller coaster and just be honest with me." (Tr. at 80.)

{¶ 13} Appellant stated that he repeatedly asked appellee to leave him alone. (Tr. at 81.) Appellant rarely spoke with appellee over the telephone and primarily communicated over text message. (Tr. at 84.) According to appellant, the last time he saw appellee was when she "brought over a due date from a doctor with the baby. She showed up eight months pregnant roughly and at that point was telling me it was mine." (Tr. at 84.) Appellant testified that appellee was concerned with a potential custody battle. (Tr. at 93.) Appellant believed appellee was "playing games" regarding the paternity of the baby. (Tr. at 95.) Appellant had bought a paternity test and asked appellee to meet at the police station. (Tr. at 96.) Appellant testified he hit a breaking point as to the paternity of the child. Appellant did not recall a time when appellee's two-year-old son had a black eye and denied that it ever happened. (Tr. at 104.)

{¶ 14} According to appellant, he met appellee at her children's daycare once at her request. They went into the building and loaded the kids into the vehicle without incident. Appellant stated, in 2018, he stopped by the daycare on two other occasions to pay appellee's bill because "she had lost her job -- or I thought she had lost her job." (Tr. at 85-86.) Appellant had previously given the kids hot wheels and admitted that he threated to take the gifts back. Appellant denied ever screaming outside appellee's residence or threatening to burn appellee's face. (Tr. at 89, 108.)

{¶ 15} On cross-examination, appellant testified to telling appellee, at the end of the relationship, that he would call the cops to get his stuff. (Tr. at 109.) Appellant did not "bring the cops," and it was a just a threat. (Tr. at 110.) Appellant denied screaming at appellee during this interaction. Appellant conceded this conversation was over the telephone but there were no threats. Appellant also conceded he has not filed a complaint to establish paternity as the biological father of the child. (Tr. at 113.) Appellant acknowledged that when one of the DNA companies contacted him about completing a paternity test, he answered the telephone in Japanese believing it was a bill collector. (Tr. at 113-14.)

{¶ 16} When asked about the text message that read, "I would be dead right now if [my daughter] didn't wake up. [* * *] This is serious now[,]" appellant stated that was in

reference to the video. (Ex. 1 at 10; Tr. at 115.) As for the next message, "[Y]ou don't want to be with me that's fine, but not knowing is going to kill me tonight," appellant stated that he was "trying to get [appellee] to give me some answers", but he was not suicidal. (Tr. at 115.) When asked if he was trying to "send [appellee] a message" to get her to respond, appellant answered "yes, sir." (Tr. at 116.) Appellant acknowledged that even after appellee referred to his messages as threatening, he kept texting appellee because he "explained to her that [he] wasn't threatening." (Tr. at 116.) Appellant denied ever choking appellee at any point. (Tr. at 118.) Appellant denied that he owns a gun. (Tr. at 119.) Appellant acknowledged that he has a felony conviction on his record involving an element of violence and pled to a charge related to abuse of another woman. (Tr. at 119.) Appellant denied having an anger problem.

{¶ 17} On redirect examination, appellant denied being present at the hospital when appellee's child was born. (Tr. at 122.) Appellant denied ever seeing appellee urinate on herself, and appellee appeared calm at the hearing. (Tr. at 123.)

{¶ 18} At the conclusion of the case, the trial court found that petitioner had met her burden of proof and granted the petition for a domestic violence protection order. On December 14, 2020, the trial court issued an order of protection against appellant. The order included appellee's three minor children as protected parties.

{¶ 19} Appellant filed a timely appeal.

## II. ASSIGNMENT OF ERROR

{¶ 20} Appellant assigns the following as trial court error:

[1] THE TRIAL COURT ERRED IN GRANTING APPELLEE'S PETITION FOR A CIVIL PROTECTION ORDER WITHOUT CONDUCTING A "FULL HEARING" AS REQUIRED BY R.C. § 3113.31 BY DISSALLOWING [SIC] RELEVANT, CREDIBILITY AND IMPEACHMENT TESTIMONY.

[2] THE TRIAL COURT ERRED AS A MATTER OF LAW AND ABUSED ITS DISCRETION BY FINDING EVIDENCE OF PREVIOUS COURT PROCEEDINGS REGARDING PETITIONER'S VERASITY [SIC.], MENTAL HEALTH, AND SIMILAR CONDUCT IRRELEVANT WHEN PETITIONER MADE INCONSISTENT STATEMENTS.

[3] THE TRIAL COURT ERRED AS A MATTER OF LAW AND ABUSE ITS DISCRETION BY FINDING TESTIMONY AND

DOCUMENTARY EVIDENCE OF PREVIOUS CIVIL PROTECTION ORDER FILINGS BY PETITIONER IRRELEVANT WHEN PETITIONER HAD PREVIOUSLY TESTIFIED THAT SHE HAD NOT FILED ANY PRIOR PETITIONS FOR CIVIL PROTECTION ORDERS.

[4] THE TRIAL COURT ERRED AS A MATTER OF LAW BY FAILING TO ADMIT EXHIBITS AND TESTIMONY RELATED TO PREVIOUS CIVIL PROTECTION ORDERS AND OTHER CERTIFIED COURT ORDERS BASED ON RELEVANCY WHEN SUCH WERE DIRECTLY RELATED TO IMPEACHMENT, CREDIBILITY, TRUTHFULNESS, AND PRIOR CONDUCT IN CONTRAVENTION OF EVID.R. 608, 613, AND 616.

[5] THE TRIAL COURT ERRED AS A MATTER OF LAW AND ABUSED ITS DISCRETION BY FINDING THAT THE MENTAL HEALTH OF THE PETITIONER IS IRRELEVALNT [SIC] TO THE OBJECTIVE REASONABLENESS OF THE PETITIONER'S FEAR AND CREDIBILITY.

[6] THE TRIAL COURT ERRED AND FAILED TO MAKE ANY FACTUAL FINDINGS TO JUSTIFY THE GRANTING OF THE PETITION FOR A CIVIL PROTECTION ORDER UNDER R.C. § 3113.

[7] THE TRIAL COURT ERRED AS THE GRANTING OF A CIVIL PROTECTION ORDER WAS NOT SUPPORTED BY THE MANIFEST WEIGHT OF THE EVIDENCE.

[8] THE TRIAL COURT ERRED IN ORDERING THE MINOR CHILDREN AS PROTECTED PERSONS UNDER THE CIVIL PROTECTION ORDER AS THERE WAS NO EVIDENCE TO JUSTIFY THEIR BEING PROTECTED UNDER THE CIVIL PROTECTION ORDER AND THE PETITION WAS NEVER AMENDED TO REQEUST [SIC] PROTECTION FOR THE CHILD BORN AFTER THE PETITION WAS FILED.

## III.  LEGAL ANALYSIS

### A. Appellant's Second, Third, Fourth, and Fifth Assignments of Error

{¶ 21} For harmony of analysis this court will address appellant's second, third, fourth, and fifth assignments of error together.  In appellant's second assignment of error, appellant argues the trial court erred by excluding evidence of prior court proceedings based on petitioner's veracity, mental health, and similar conduct when appellee made

inconsistent statements. In appellant's third assignment of error appellant argues that the trial court erred in finding that the prior civil protection order filings were irrelevant. In appellant's fourth assignment of error, the trial court erred in failing to admit exhibits and testimony of previous civil protection orders and other court documents based on relevancy when related to impeachment, truthfulness, and prior conduct in violation of Evid.R. 608, 613, and 616. In appellant's fifth assignment of error, appellant argues that the trial court erred by finding that the mental health of petitioner was irrelevant to the objective reasonableness of the petitioner's fear and credibility.

{¶ 22} As an initial matter, we note that appellant's brief fails to comply with App.R. 16 as he failed to separately argue each assignment of error. App.R. 16(A)(7) requires each assignment of error to include "[a]n argument containing the contentions of the appellant with respect to each assignment of error presented for review." While it is within the reviewing court's discretion to consider assignments of error together, the parties do not have this choice and are obligated to argue each assignment of error separately in their brief. *Fiorilli Constr., Inc. v. A. Bonamase Contracting, Inc.*, 8th Dist. No. 94719, 2011-Ohio-107, ¶ 30. While App.R. 12(A) allows this court to disregard an assignment of error not separately argued in its brief, in the interests of justice, we will address appellant's arguments to the extent they contend that the trial court abused its discretion in excluding testimony and exhibits as to the prior court documents and appellee's mental health.

{¶ 23} The admissibility of evidence falls within the trial court's broad discretion. *Beard v. Meridia Huron Hosp.*, 106 Ohio St.3d 237, 2005-Ohio-4787, ¶ 20, citing *State v. Hymore*, 9 Ohio St.2d 122, 128 (1967). A trial court's ruling on evidentiary issues will not be disturbed absent an abuse of discretion that has resulted in materially prejudice. *Beard* at ¶ 20. Abuse of discretion is a determination by the court that is arbitrary, unreasonable, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). The Supreme Court of Ohio, however, has recently clarified this standard of review noting that all "courts lack the discretion to make errors of law, particularly when the trial court's decision goes against the plain language of a statute or rule." *Johnson v. Abdullah*, 166 Ohio St.3d 427, 2021-Ohio-3304, ¶ 39. " 'Even in the event of an abuse of discretion, a judgment will not be disturbed unless the abuse affected the substantial rights of the adverse party or is inconsistent with substantial justice.' " *Maiorana v. Walt Disney Co.*, 10th Dist. No. 20AP-

207, 2021-Ohio-4530, ¶ 49, quoting *Beard* at ¶ 20, citing *O'Brien v. Angley*, 63 Ohio St.2d 159, 164-65 (1980).

### 1. Court Documents

{¶ 24} Appellant argues that the trial court erred by excluding exhibits and certain testimony as appellee had made inconsistent statements regarding her previously filed protection orders.  The trial court excluded the exhibits as irrelevant.

{¶ 25} Evid.R. 401 states "[r]elevant evidence" is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Pursuant to Evid.R. 613, "[i]n examining a witness concerning a prior statement made by the witness, whether written or not, the statement need not be shown nor its contents disclosed to the witness at that time, but on request the same shall be shown or disclosed to opposing counsel."  Evid.R. 613(A).  Furthermore, extrinsic evidence of a prior inconsistent statement by a witness is admissible if both of the following apply:

> (1) If the statement is offered solely for the purpose of impeaching the witness, the witness is afforded a prior opportunity to explain or deny the statement and the opposite party is afforded an opportunity to interrogate the witness on the statement or the interests of justice otherwise require;
>
> (2) The subject matter of the statement is one of the following:
> (a) A fact that is of consequence to the determination of the action other than the credibility of a witness;
> (b) A fact that may be shown by extrinsic evidence under Evid.R. 608(A), 609, 616(A), or 616(B);
> (c) A fact that may be shown by extrinsic evidence under the common law of impeachment if not in conflict with the Rules of Evidence.

Evid.R. 613(B).

When concerning the introduction of extrinsic evidence of prior inconsistent statement this court has previously stated:

> Evid.R. 613(B), thus, allows introduction of extrinsic evidence of a prior statement only after a proper foundation has been laid through direct or cross-examination in which: " ' "(1) the witness * * * is presented with the former statement; (2) the witness is asked whether he made the statement; (3) the witness is given an opportunity to admit, deny or explain the statement; and (4) the opposing party is given an opportunity

> to interrogate the witness on the inconsistent statement." ' "
> *State v. Kulasa*, 10th Dist. No. 11AP-826, 2012-Ohio-6021, ¶
> 12, quoting *State v. Mack*, 73 Ohio St.3d 502, 514-15, 1995-
> Ohio-273, 653 N.E.2d 329 (1995), quoting *State v. Theuring*,
> 46 Ohio App.3d 152, 155, 546 N.E.2d 436 (1st Dist.1988). If a
> witness denies making a prior inconsistent statement, a proper
> foundation has been laid, and if, in addition, the prior
> inconsistent statement does not relate to a collateral matter,
> extrinsic evidence is admissible. *Kulasa* at ¶ 19. If a witness
> admits having made the contradictory statements, however,
> then extrinsic evidence of the prior inconsistent statement is
> not admissible. *In re M.E.G.*, 10th Dist. No. 06AP-1256, 2007-
> Ohio-4308; *State v. Hill*, 2d Dist. No. 20028, 2004-Ohio-
> 2048, ¶ 40.

*State v. Ollison*, 10th Dist. No. 16AP-95, 2016-Ohio-8269, ¶ 60, quoting *State v. Ferguson*, 10th Dist. No. 12AP-1003, 2013-Ohio-4798, ¶ 15.

{¶ 26} Upon review, Exhibit A is a 2012 civil protection order petition by appellee against her ex-husband, Andrew Cunningham purportedly as part of a divorce filing. Similarly, Exhibit B is a 2015 petition for a domestic violence civil protection order by appellee against the father of one of her minor children. These documents also include various orders and entries from the magistrate and statements from the parties in the respective cases. After consideration of the evidence, we find the trial court's ruling was not an abuse of its discretion that resulted in material prejudice to appellant. It is not unreasonable to find that the petition filed by appellee against her ex-husband in a divorce proceeding was irrelevant as it involved an unrelated matter and a different respondent from the case at issue. Similarly, the exclusion of the petition and filings by appellee against her child's father in a custody matter as irrelevant is also not unreasonable. While appellee did initially testify that she had not previously filed a protection order, appellee explained she interpreted the question as asking whether she had filed a standalone petition like this proceeding and not as part of custody or divorce matter. (Tr. at 66.) There is no doubt from the transcript that appellee acknowledged that she had made these two filings. Therefore, appellee admitted and explained the contradictory statement.

{¶ 27} Regardless, even if these documents were relevant and had been admitted as exhibits, appellant fails to demonstrate how their exclusion materially prejudiced his case. Appellee initially testified that she had not filed a protection order, when she had, in fact,

filed two such petitions in her divorce and custody cases. The admission of the exhibits would not have provided anymore material information than what was already in the record. Appellant made his point. Despite this line of questioning as to the inconsistent statement by appellee regarding her prior filings, the trial court, however, found appellee more credible and granted the petition.

{¶ 28} Appellant next argues the trial court erred by excluding a decision by a Licking County magistrate from her custody case. The trial court denied the admission of the exhibit as irrelevant. Pursuant to Evid.R. 611, the trial court must "exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment." A trial court in a bench trial is particularly positioned to evaluate the evidence and credibility of witnesses. *Ahmmad v. Ahmed*, 10th Dist. No. 14AP-736, 2015-Ohio-2537, ¶ 38 (writing a written record cannot convey on appeal a witnesses' demeanor, gestures, and voice inflections).

{¶ 29} We find the trial court's exclusion of the exhibit was not an abuse of discretion. Here, appellant attempted to utilize the magistrate's ruling in the custody case to demonstrate appellee is untruthful. The trial court is entitled to the same opportunity to determine credibly as the magistrate in the Licking County proceeding. The trial court is under no obligation to accept another trier of fact's credibility determination in a wholly unrelated matter. One does not inform the other. It is not inconsistent for one court to determine an individual is not credible in one case, and credible in another. As such, the appellant has failed to demonstrate how this decision is relevant to the instant case or that he was materially prejudiced by the exclusion of the Licking County decision.

{¶ 30} Appellant also argues that the trial court erred excluding Exhibits A and B in violation of Evid.R. 616(B) and (C) as well as Evid.R. 608. Appellant, however, failed to raise these arguments to the trial court at the hearing. As such, appellant has waived all but plain error analysis as to this issue.

{¶ 31} "An appellate court recognizes plain error with the utmost caution, under exceptional circumstances, and only to prevent a miscarriage of justice." *State v. Mankin*, 10th Dist. No. 19AP-650, 2020-Ohio-5317, ¶ 15, citing *State v. Pilgrim*, 184 Ohio App.3d

675, 2009-Ohio-5357, ¶ 58 (10th Dist.), citing *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, ¶ 139. "For an error to be a 'plain error' under Crim.R. 52(B), it must satisfy three prongs: (1) there must be an error, meaning a deviation from a legal rule, (2) the error must be 'plain,' meaning an 'obvious' defect in the trial proceedings, and (3) the error must have affected 'substantial rights,' meaning the error must have affected the outcome of the trial." *Mankin* at ¶ 16, citing *State v. Barnes*, 94 Ohio St.3d 21, 27, 2002-Ohio-68 (2002).

{¶ 32} Upon review, we decline to further expand our discussion as to the merits of the evidentiary arguments as, regardless of appellant's argument, even if the error was clear, the exclusion of these exhibits and testimony did not affect appellant's substantial rights as to affect the outcome of the hearing. The trial court was aware of the prior court proceedings based on testimony at the hearing. Again, appellant has failed to persuade this court that the inclusion of this testimony would have changed the outcome in this case.

### 2. Mental Health

{¶ 33} Next, appellant argues that the trial court erred in sustaining an objection regarding appellee's mental health and exclusion of the magistrate's decision in the Licking County matter. Appellant contends this evidence shows appellee's propensity for dishonesty and concerns about her mental health. Appellant also argues the mental health testimony was permissible because appellee admitted to seeing a psychiatrist and taking anxiety medicine.

{¶ 34} Appellant asked at trial if appellee had a mental health diagnosis, which the trial court sustained as irrelevant. Regardless of the merits of appellant's argument, appellant fails to demonstrate how the exclusion of this single question resulted in material prejudice. First, appellee admitted to seeing a psychiatrist and taking medication for anxiety as well as issues with sleep from appellant's behavior. It is reasonable to believe that the answer to this question would have largely repeated testimony already in the record. Moreover, there is significant evidence presented in this case as to the actions of appellant that are not in dispute unrelated to any potential mental diagnosis of appellee. There is no dispute as to much of the evidence before the court, most notably the text messages sent to appellant, the image of the jump rope tied to a banister, and video of appellant attempting suicide. Regardless of any further examination of appellee's mental health, the actions of appellant were obvious.

{¶ 35} It is also unclear what other testimony appellant believes would have come from his cross-examination of appellee on this issue as he failed to proffer additional questions or state on the record what he believed would have come from such testimony. Appellant argues that all issues related to the mental health of the appellee were preserved as they were "reflected in the offered documentary evidence whereby there was a judicial determination that the Appellee had mental health issues and had an extreme propensity for untruthfulness."  (Reply Brief at 12.)  We are not persuaded that the credibility determination of a magistrate in a different case plays any role in the trial court's analysis. The trial court is the trier of fact and must make its own conclusions on credibility of the witnesses.  Moreover, even if assuming appellant's evidentiary argument has merit on this point, based on the evidence in this case, any error on this issue would have been harmless. *See* Civ.R. 61.

{¶ 36} Appellant's second, third, fourth, and fifth assignments of error are overruled.

## B. Appellant's First Assignment of Error

{¶ 37} In appellant's first assignment of error, he argues the trial court erred by not allowing him a "full hearing," as defined under R.C. 3113.31, based on the above-mentioned evidentiary issues set forth in the previous section.

{¶ 38} "The decision to grant a civil protection order lies within the sound discretion of the trial court." *Martin v. Martin*, 10th Dist. No. 13AP-171, 2013-Ohio-5703, ¶ 6, quoting *Daughtry v. Daughtry*, 10th Dist. No. 11AP-59, 2011-Ohio-4210, ¶ 5, citing *Parrish v. Parrish*, 95 Ohio St.3d 1201, 2002-Ohio-1623 (2002).  Here, however, appellant alleges the trial court did not allow him a "full hearing" within the meaning of R.C. 3113.31.  Where an appeal requires an analysis of R.C. 3113.31, the civil domestic violence statute, we apply a de novo standard of review. *D.M.W. v. E.W.,* 10th Dist. No. 17AP-359, 2018-Ohio-821, ¶ 11, citing *Hope Academy Broadway Campus v. Ohio Dept. of Edn.*, 10th Dist. No. 07AP-758, 2008-Ohio-4694, ¶ 13.

{¶ 39} Pursuant to R.C. 3113.31, when a petitioner seeks a civil protection order and requests an ex parte hearing, the trial court is required to hold a hearing on the same day and, if good cause is shown, may enter an ex parte temporary order.  *D.M.V*. at ¶ 11, citing R.C. 3113.31(D)(1).  If the trial court issues an ex parte order, "the court shall schedule a full

hearing for a date that is within seven court days after the ex parte hearing." R.C. 3113.31(D)(2)(a). However, the term "full hearing" is not defined under the statute. *Tarini v. Tarini*, 10th Dist. No. 12AP-336, 2012-Ohio-6165, ¶ 14, citing *Deacon v. Landers*, 68 Ohio App.3d 26, 587 N.E.2d 395 (4th Dist.1990). In *Tarini*, this court considered the meaning of "full hearing" under R.C. 3113.31(D)(2)(a). We wrote, generally, a "full hearing" " 'is one in which ample opportunity is afforded to all parties to make, by evidence and argument, a showing fairly adequate to establish the propriety or impropriety of the step asked to be taken.' " *Tarini* at ¶ 14, quoting *Deacon* at 30. " '[W]here the issuance of a protection order is contested, the court must, at the very least, allow for presentation of evidence, both direct and rebuttal, as well as arguments.' " (Footnote omitted.) *Id.*

{¶ 40} Appellant argues that the trial court's evidentiary determinations, set forth in assignments of error two through five, precluded him from receiving a "full hearing" under R.C. 3113.31(D)(2). We disagree. The denial of a full hearing is not the exclusion of certain evidence during the hearing but concerns the deprivation of the opportunity to be heard. *See D.M.W.*, ¶ 12-13 (concluding the trial court deprived appellant of a full hearing, as required by R.C. 3113.31, when "[t]he trial court was aware appellant and his counsel were present and prepared for a full contested hearing, yet it did not permit appellant or counsel to appear before the court to present evidence."); *J.S. I* at ¶ 25 (finding the trial court denied L.S. a "full hearing" when "it considered evidence submitted by J.S. without allowing L.S. to review the evidence and in conducting independent factual research without allowing L.S. to respond."); *H.C. v. R.C.*, 10th Dist. No. 15AP-936, 2016-Ohio-668, ¶ 16 (concluding the trial court failed to provide appellant a full hearing under R.C. 3113.31 by denying him the opportunity to complete his cross-examination of the minor child, call his own witnesses, or present evidence in his own defense); *Spigos v. Spigos*, 10th Dist. No. 03AP-682, 2004-Ohio-757 (finding the trial court erred in failing to provide the petitioner a full hearing under R.C. 3113.31 when the court interrupted her testimony, requested to speak with counsel off the record, and then entered judgment against the petitioner on the basis that she had failed to meet her burden to grant the petition for a domestic violence protection order).

{¶ 41} In the case sub judice, there is no dispute that appellant was served with a copy of the petition and was given an opportunity to be heard and present evidence at the

October 26, 2020 hearing. The only assertion that a "full hearing" was not granted is involving the exclusion of certain exhibits and questions that the trial court deemed irrelevant. In our view, appellant's argument concerns an evidentiary issue that, under the facts of this case, did not preclude appellant from a "full hearing" as intended under R.C. 3113.31. Allowing such an interpretation would severely impede the trial court's broad authority as to evidentiary matters. While " '[o]ne of the fundamental due process rights is the right to present witnesses in one's behalf,' the 'right may be tempered by judicial discretion and the laws of evidence.' " *Tarini* at ¶ 17, quoting *In re Houseman v. Houseman*, 4th Dist. No. 831, 1981 Ohio App. LEXIS 13378 (Oct. 30, 1981). Based on the foregoing, we find appellant was provided a full hearing as contemplated under R.C. 3113.31.

{¶ 42} Appellant's first assignment of error is overruled.

## C. Appellant's Sixth Assignment of Error

{¶ 43} In appellant's sixth assignment of error, appellant argues that the trial court erred in failing to include any findings of fact to justify the granting of the petition for a civil protection order under R.C. 3113.31.

{¶ 44} Effective June 1, 2012, Civ.R. 65.1 governs domestic violence civil protection orders, civil stalking protection orders, and sexually-oriented offense civil protection orders. *M.D. v. M.D.*, 8th Dist. No. 106581, 2018-Ohio-4218, ¶ 46, citing *Weber v. Forinash*, 6th Dist. No. S-14-034, 2015-Ohio-3187, ¶ 30. Civ.R. 65.1 was enacted, in part, to expedite the process of obtaining a protection order after a full hearing, which was inconsistent with aspects of Civ.R. 53. *M.D.* at ¶ 47-48. "As such, it 'uniquely applies to the special statutory proceeding set forth in R.C. 3113.31, which provides the requirements for the entry of a CPO against adults for the protection of victims of domestic violence.' " *Besman v. Leventhal*, 8th Dist. No. 104414, 2017-Ohio-464, ¶ 4, quoting *Heimann v. Heekin*, 1st Dist. No. C-130613, 2014-Ohio-4276, ¶ 5. In an effort to streamline proceedings for protection orders, Civ.R. 65.1, unlike Civ.R. 53, "does not provide for a request for findings of fact and conclusions of law." *B.L.L. v. M.T.*, 7th Dist. No. 21MA0021, 2021-Ohio-4300, ¶ 39, quoting *Insa v. Insa*, 2d Dist. No. 26909, 2016-Ohio-7425, ¶ 27.

{¶ 45} Generally, a court will only speak through its entries, as "[n]either the parties nor a reviewing court should have to review the trial court record to determine the court's intentions. Rather, the entry must reflect the trial court's action in clear and succinct

terms." *Infinite Sec. Solutions, L.L.C. v. Karam Props. II*, 143 Ohio St.3d 346, 2015-Ohio-1101, ¶ 29.  The Supreme Court, however, has also recognized that "requiring specific or hypertechnical language is inefficient and counterproductive." *Id.* at ¶ 31.  In the interest of justice, a reviewing court may examine the entire entry and proceedings to identify the grounds upon which the judgement is based.  *Joyce v. Gen. Motors Corp.*, 49 Ohio St.3d 93, 551 N.E.2d 172 (1990), paragraph one of the syllabus, citing *A. B. Jac, Inc. v. Liquor Control Comm.*, 29 Ohio St.2d 139 (1972); *see also State ex rel. Midwest Pride IV, Inc. v. Pontious*, 75 Ohio St.3d 565, 569 (1996) ("A reviewing court must examine the entire journal entry and the proceedings below where necessary to ascertain the precise basis of a lower court's judgment."); *Miller v. Grimsley* (*In re Grimsley)*, 449 B.R. 602 (Bankr. S.D.Ohio 2011) (finding that while a court speaks through its written orders and judgments "there is nothing in the principle that prohibits a court from reviewing the entire record of a case when deciding the grounds for, or the meaning of, a court's judgment or order.  To the contrary, a court clearly may do so").

{¶ 46} Appellee contends that appellant failed to request findings of fact in this case and, as such, may not assert this argument on appeal.  Appellee's argument fails in this regard as Civ.R. 65.1 does not allow for the filing of a request for findings of fact and conclusions of law. *See Besman* at ¶ 5 (finding "it would be *inconsistent* with Civ.R. 65.1 to allow a request for findings of fact and conclusions of law because it would delay the proceedings.") (emphasis sic.)  Appellant, however, is also incorrect in his statement that the trial court failed to provide any findings of fact to justify granting the petition for a protection order.  The trial court, in its December 14, 2020 order wrote, "by a preponderance of the evidence: 1) that the Petitioner or Petitioner's family or household member (s) (sic) are in danger of or have been a victim of domestic violence or sexually oriented offenses as defined in R.C. 3113.31 (A) (sic) committed by Respondent; and 2) the following orders are equitable, fair, and necessary to protect the persons named in this Order from domestic violence." (Order of Protection at 2.)  While the trial court's analysis is certainly concise, it clearly and succinctly found the petitioner and her household members were in danger of or have been victims of domestic violence as defined under R.C. 3113.31.  A brief look at the trial court's ruling from the bench at the hearing confirms this conclusion:

> The motive behind the civil protection order for public policy is to protect petitioners from domestic violence, and after looking at the scope of testimony as it originally occurred, I do believe that at the hearing, petitioner provided the Court with enough credible testimony and/or evidence which did not significantly deviate from the original petition reviewed and approved by this Court on June 3rd, 2019, to substantiate her reasonable fear and justify an award of a civil protection order.
>
> Again, looking at the evidence, it is a preponderance of the evidence, and I have considered all the evidence of the parties, the testimony of both witnesses, and the demeanor of both witnesses in the courtroom. And I do believe that the threshold of the preponderance of the evidence has been met.
>
> Specifically this Court finds that petitioner was placed in fear of imminent serious physical harm by the threats and/or action by the respondent, and this fear is objectively reasonable given the circumstances of the case. I do not find the pattern of stalking.
>
> The Court finds by a preponderance of the evidence that the petitioner has been the victim of domestic violence as defined by Ohio Revised Code 3113.31(A) committed by the respondent, and that the following orders are equitable, fair and necessary to protect the person's name in this order from domestic violence.

(sic passim.) (Tr. at 134-36.)

{¶ 47} Here, the findings of fact, in conjunction with the trial court's oral pronouncements at the conclusion of the trial, established as fact the evidence offered by appellee that she is in danger of or has been victim of domestic violence as defined under the statute. *Besman* at ¶ 10[1] (finding the trial court's findings of fact, while not

---

[1] The trial court's finding of fact in *Besman* was similarly concise stating:

> Petitioner was sworn and gave testimony that supports finding that Respondent committed domestic violence as defined in O.R.C. §3113.31 and that the Petitioner is in danger of Domestic [sic] violence. Her testimony is found to be credible. Sgt. Lesner and Matthew Besman are found to be credible. Dr. Horowitz testimony was minimal. Respondent was obstreperous throughout the trial and his testimony is found to be both evasive and self-serving.
>
> The Court further finds by a preponderance of the evidence: 1) that the Petitioner or Petitioner's family or household members are in danger of or have been a victim of domestic violence or sexually oriented offenses as defined in R.C. 3113.31(A) committed by Respondent; and 2) the following orders are equitable, fair, and necessary to protect the persons named in this Order from domestic violence.

*Besman* at ¶ 8.

comprehensive, are adequate to allow a reviewing court to determine the existence of assigned error.) Accordingly, the findings of fact from the trial court are satisfactory to enable a reviewing court to review the existence of error. While the trial court would be better served with a more expansive examination in the order, its analysis at the conclusion of the hearing resolves any concerns by this court as to its ruling on this matter.

{¶ 48} Appellant's sixth assignment of error is overruled.

## D. Appellant's Seventh Assignment of Error

{¶ 49} In appellant's seventh assignment of error, he argues that the trial court's ruling granting appellee's petition for a civil protection order was against the manifest weight of the evidence.

{¶ 50} This court will review a trial court's grant of a civil protection order to " ' "determine whether sufficient, credible evidence supports a finding that the respondent had engaged in acts or threats of domestic violence." ' " *T.S. v. B.S.*, 10th Dist. No. 18AP-302, 2018-Ohio-4987, ¶ 21, quoting *Fleckner v. Fleckner*, 177 Ohio App.3d 706, 2008-Ohio-4000, ¶ 15 (10th Dist.), quoting *Kabeer v. Purakaloth*, 10th Dist. No. 05AP-1122, 2006-Ohio-3584, ¶ 7. A reviewing court will not reverse the trial court's award of a civil protection order as being against the manifest weight of the evidence absent a finding that there was not "some competent, credible evidence [that] goes to the essential elements of the case." *Id.* If the evidence is susceptible to more than one interpretation, a reviewing court must construe the evidence consistent with the trial court's order. *Id.* An appellate court presumes that the trial court's findings are accurate as it was best positioned to view the witnesses and weigh the credibility of their testimony. *Dennison v. Dennison*, 10th Dist. No. 19AP-335, 2020-Ohio-2800, ¶ 28.

{¶ 51} As set forth in R.C. 3113.31(A)(1), domestic violence is defined as the occurrence of at least one of the following: "(i) [a]ttempting to cause or recklessly causing bodily injury; (ii) [p]lacing another person by the threat of force[2] in fear of imminent

---

[2] R.C. 3113.31(A)(1)(a)(ii) does not define "force," "serious physical harm," or "imminent." *M.D.* at ¶ 69. R.C. 2901.01(A)(1), however, defines "force" as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." "Serious physical harm" is defined in R.C. 2901.01(A)(5) as:

(a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;
(b) Any physical harm that carries a substantial risk of death;

serious physical harm or committing a violation of section 2903.211 or 2911.211 of the Revised Code; (iii) [c]ommitting any act with respect to a child that would result in the child being an abused child as defined in section 2151.031 of the Revised Code; and (iv) [c]ommitting a sexually oriented offense." A petitioner seeking a civil protection order must prove domestic violence or a threat of domestic violence by a preponderance of the evidence. *Johnson v. Auls*, 10th Dist. No. 08AP-286, 2008-Ohio-6123, ¶ 5, citing *Felton v. Felton*, 79 Ohio St.3d 34 (1997), paragraph two of the syllabus. "Domestic violence" also includes the occurrence of one or more of these acts against a person with whom the respondent is or was in a dating relationship. R.C. 3113.31(A)(1)(b).

{¶ 52} For the purposes of R.C. 3113.31, the threat of force constitutes domestic violence if the fear from those threats is reasonable. *Fleckner* at ¶ 21, quoting *Lavery v. Lavery*, 9th Dist. No. 20616, 2001-Ohio-1874, *4-5, *discretionary appeal not allowed*, 95 Ohio St.3d 1409 (2002). The history between the parties is instructive as to the reasonableness of the fear at issue. *Fleckner* at ¶ 21, citing *Gatt v. Gatt*, 9th Dist. No. 3217-M, 2002-Ohio-1749, citing *Eichenberger v. Eichenberger*, 82 Ohio App.3d 809, 816, 613 N.E.2d 678 (1992) (finding that while the respondent had not previously caused physical harm to the petitioner, the petitioner's fear that respondent would now carry out his threat to kill her was reasonable and not irrational). Courts use both a subjective and objective test to resolve the reasonableness of the petitioner's fear. The subjective test "inquires whether the respondent's threat of force actually caused the petitioner to fear imminent serious physical harm." *Fleckner* at ¶ 23. The objective test looks at "whether the petitioner's fear is reasonable under the circumstances (that is, whether the respondent's threat would cause a reasonable person to fear imminent [unconditional, non-contingent] serious physical harm)." *Id.*

{¶ 53} While the trial court " 'may consider past acts to determine whether the incident at issue constitutes domestic violence, the issuance of a civil protection order

---

(c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;
(d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;
(e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

cannot be based solely on previous incidents of alleged domestic violence.' " *E.W. v. T.W.*, 10th Dist. No. 16AP-88, 2017-Ohio-8504, ¶ 36, quoting *Solomon v. Solomon*, 157 Ohio App.3d 807, 2004-Ohio-2486, ¶ 23, citing *Bruner v. Bruner*, 7th Dist. No. 99CA285 (Sept.22, 2000). However, " 'imminence does not require an offender to carry out a threat immediately or be in the process of carrying it out [b]ecause civil protection orders are intended to prevent violence before it happens[.]' " *M.D.* at ¶ 68-73, quoting *Young v. Young*, 2d Dist. No. 2005-CA-19, 2006-Ohio-978, ¶ 105. Under R.C. 3113.31, the critical inquiry in determining whether the threat was "imminent" is " ' "whether a reasonable person would be placed in fear of imminent (in the sense of unconditional, non-contingent) serious physical harm." ' " *T.S.* at ¶ 24, quoting *Fleckner* at ¶ 20, quoting *Maccabee v. Maccabee*, 10th Dist. No. 98AP-1213, 1999 Ohio App. LEXIS 2992 (June 29, 1999).

**{¶ 54}** There is no dispute that appellant stated that he would "burn" appellee. While appellant contends that this was stated in a different context, appellee testified she interpreted the phrase, in conjunction with appellant's prior statements that she would not be a pretty face anymore, that appellant was going to bring her harm. "I don't know how to feel other than you were going to seriously hurt me." (Tr. at 11.) Appellee also testified that she believed appellant's text message "they can't keep me forever," that appellant would see her "at the hospital," and that she was a "white trash whore" were threats. Appellant does not dispute these text messages were sent but contends they were sent in a different context and were not threats.

**{¶ 55}** Appellee also testified as the video and accompanying text messages related to appellant's suicide attempt. Appellant texted appellee, "I'm serious [appellee], I will be dead by morning." (Tr. at 17.) Appellee testified to a picture from appellant of a jump rope tied to the banister with the message, "if I want to keep not taking him seriously, he hoped it was on my conscious forever." (Tr. at 18.) Appellee stated that appellant would consistently make threats that he would harm himself and these messages made her "afraid that if he did--if he did follow through with it, what it would mean to his girls and how I would be responsible, and that if he didn't follow through and I didn't contact him, that he would come after me and harm me because I didn't respond in the way that he felt was appropriate." (Tr. at 17-18.) Appellee testified that she watched the video before reading the text message and believed appellant was dead. (Tr. at 18-19.) Appellee testified the

video began with appellant standing with a rope around his neck and a few moments later appellant's daughter walked out from her room before the appellant exclaimed "shit." (Tr. at 21.) Appellee received a text message from appellant that stated, "I would be dead right now if [appellant's daughter] didn't wake up." (Tr. at 22.) Again, appellant does not deny these messages were sent but contends that it was his way of getting an answer from appellee regarding the paternity of her youngest child.

{¶ 56} Regarding the text message, "You don't want to be with me that's fine, but not knowing is going to kill me tonight," appellant stated that he was "trying to get her to give me some answers" but he was not suicidal. (Tr. at 115.) When appellant was asked if this was trying to "send [appellee] a message," appellant responded "yes, sir." (Tr. at 116.) Appellee testified that she is fearful of appellant causing her imminent serious bodily harm. Despite knowing that appellee referred to his messages as threatening, appellant said he kept texting appellee because he "explained to her that [he] wasn't threatening." (Tr. at 116.) Appellee stated that she experienced mental distress from the video and reading the text messages. Appellee could not get out of bed and could not focus or live her life without thinking appellant was going to bring her harm. Appellee testified that she is now seeing a psychiatrist and taking medication because she could not sleep. Appellee changed jobs out of fear that appellant would hurt her at work. Appellee also alleged that she urinated in her pants when appellant walked by her during a court hearing. (Tr. at 24.) Moreover, there is no dispute appellee has previously shot himself and has a felony conviction on his record involving an element of violence.

{¶ 57} After review of the hearing transcript and relevant evidence, the trial court's ruling was not against the manifest weight of the evidence. The trial court is best positioned to observe the parties and their testimony and make a determination as to their credibility. *Nkurunziza v. Nyamusevya*, 10th Dist. No. 10AP-134, 2010-Ohio-5966, ¶ 10. "We will not second-guess those credibility determinations on appeal." *Id.* Given the turbulent history between the parties, text messages, and suicide video, there was sufficient competent, credible evidence to support the trial court granting the civil protection order.

{¶ 58} Appellant's seventh assignment of error is overruled.

**E. Appellant's Eighth Assignment of Error**

{¶ 59} In appellant's eighth assignment of error, he argues the trial court erred in including the minor children as protected persons as there was no evidence to justify their inclusion in the protection order. Appellant also argues that the petition was never formally amended to request the protection of the third child born after the petition was filed.

{¶ 60} R.C. 3113.31 explicitly provides the trial court with the authority to craft a protection order tailored to the unique circumstances of the case. As such, this court will review the scope of the civil protection order under an abuse of discretion analysis. *T.S.* at ¶ 27. "Further, when issuing a civil protection order where domestic violence exists, the court is prompted to consider not only the petitioner but also the []petitioner's family or household members[]." (Internal quotations omitted.) *Woolum v. Woolum*, 12th Dist. No. CA98-07-010, 131 Ohio App.3d 818, 824 (1999), quoting *Felton v. Felton*, 79 Ohio St.3d 34 (1997), paragraph two of the syllabus. *McBride v. McBride*, 12th Dist. No. CA2011-03-061, 2012-Ohio-2146, ¶ 25. (Internal quotations omitted.) ("The trial court did not err in issuing a CPO on behalf of E.M. in light of our previous holding that placing children in an environment where there is a substantial risk to their health and safety constitutes one form of domestic violence."); *see also Martindale v. Martindale*, 4th Dist. No. 17CA5, 2017-Ohio-9266, ¶ 55.

{¶ 61} There was sufficient testimony at trial to support the inclusion of appellee's minor children as protected parties. Appellee testified that appellant struck her two-year-old son. Appellee testified that appellant admitted to the incident stating that the child was acting up in a store. Appellant denied the incident ever happened. Appellee also alleged that appellant visited her children's daycare on multiple occasions without invitation. Appellant testified that he once visited the daycare at appellee's invitation and on two other occasions went to the daycare to pay part of appellee's bill. In its December 14, 2020 order, the trial court found, "by a preponderance of the evidence: 1) that the Petitioner or Petitioner's family or household member (s) (sic) are in danger of or have been a victim of domestic violence or sexually oriented offenses as defined in R.C. 3113.31 (A) (sic) committed by Respondent; and 2) the following orders are equitable, fair, and necessary to protect the persons named in this Order from domestic violence." The trial court also stated at the conclusion of the hearing, "I do believe that at the hearing, petitioner provided the

Court with enough credible testimony and/or evidence which did not significantly deviate from the original petition reviewed and approved by this Court on June 3rd, 2019, to substantiate her reasonable fear and justify an award of a civil protection order." (Tr. at 134-35.) While the evidence was conflicting and uncorroborated, the trial court found appellee's testimony more credible than appellant's testimony in this case. Given these facts, we find the trial court was not unreasonable in the scope of the order to include the minor children as protected parties.

{¶ 62} Regarding the inclusion of the newborn child as a protected party, appellee was pregnant at the time she filed her petition for a protection order. Before the full hearing commenced, appellee had given birth to the child. There is no dispute that appellee testified that she wanted her children included in the order as protected parties. (Tr. at 66.) This would logically include the newborn not initially identified in the petition as a protected person. Ohio courts have found a trial court may exclude individuals that a petitioner asked to be included in the order if the evidence does not support their inclusion as a protected party. *See, e.g., Hyde v. Smith*, 12th Dist. No. CA2014-09-193, 2015-Ohio-1701 (finding the trial court erred including petitioner's father, mother, and brother as additional protected parties as they, despite their inclusion in the petition, did not meet the definition of "family or household members" under R.C. 3113.31(A)(3)). It is, therefore, logical that a trial court, having been authorized by statute to tailor the order to the unique circumstances of the case, may add a minor child, born after the petition was filed but before the full hearing, that is also at risk of harm from the appellant. Moreover, there is no evidence in the record that appellant has a familial relationship or custodial interest in any of these children. As the trial court's determination that the minor children should be included in the protection order was reasonable, we cannot say that the trial court's inclusion of the third minor child to the protection order was an abuse of discretion.

## IV. CONCLUSION

{¶ 63} Having overruled appellant's eight assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations and Juvenile Branch.

*Judgment affirmed.*

KLATT, J., concurs.

DORRIAN, J., concurs in judgment only.

_____