[Cite as *Mahbub v. Mahbub*, 2025-Ohio-5867.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Jacqueline Mahbub, | : | |
| Plaintiff-Appellant, | : | No. 24AP-586 |
| | | (C.P.C. No. 20DR-1272) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Shahan Mahbub, | : | |
| Defendant-Appellee. | : | |

D E C I S I O N

Rendered on December 31, 2025

**On brief:** *Grossman Law Offices*, and *John H. Cousins IV*, for appellant.
**Argued:** *John H. Cousins IV*.

**On brief:** *Law Office of Anthony W. Greco, Anthony W. Greco, Susan M. Suriano*, and *Anthony W. Greco, Jr.*, for appellee.
**Argued:** *Anthony W. Greco*.

APPEAL from the Franklin County Court of Common Pleas,
Division of Domestic Relations and Juvenile Branch

MENTEL, J.

{¶ 1}  Plaintiff-appellant, Jacqueline Mahbub, n.k.a. Jacqueline Son, appeals from an August 23, 2024 decision and judgment entry divorce decree from the Franklin County Court of Common Pleas, Division of Domestic Relations and Juvenile Branch.  For the reasons that follow, we reverse.

## I. Facts and Procedural History

{¶ 2}  The parties were married on September 29, 2012, until the agreed upon termination date of March 31, 2020.  During the marriage, the parties had one child, A.M. (d.o.b. November 1, 2016).  On April 14, 2020, Ms. Son filed a complaint for divorce.

Mr. Mahbub filed an answer and counterclaim on April 21, 2020. On June 2, 2020, Chelsea Long was appointed as guardian ad litem ("GAL") in the case. The parties submitted their first and second agreed temporary magistrate's order on August 13 and October 5, 2020, respectively. The August 13, 2020 order designated Ms. Son as the temporary residential parent and legal custodian of the minor child and required her to consult with Mr. Mahbub on child-related matters. The temporary order ran from August 13, 2020 until July 2, 2023. Mr. Mahbub was permitted a Wednesday midweek visit and alternating weekends with a step-up provision. If Mr. Mahbub could maintain sobriety and continue therapy, the trial court, in consultation with the GAL, would increase his parenting time. The October 5, 2020 order concerned spousal and child support payments. The trial court entered an order for custody evaluation, to be performed by Jamie Niesen, on March 2, 2021. As documented in the August 3, 2021 agreed amended temporary magistrate's order, Mr. Mahbub received increased parenting time during the life of the case. On September 16, 2021, the parties filed an agreed entry granting the motion for a vocational assessment of Ms. Son. On September 2, 2022, the parties filed an agreed order regarding litigation fees. Ms. Son's vocational evaluation was filed on December 27, 2022.

{¶ 3} The parties filed a separation agreement on January 10, 2023. On January 17, 2023, the parties filed an agreed entry regarding trial stipulations. Relevant to the instant case, the parties agreed that Mr. Mahbub "shall pay guideline child support of $1,395.48 per month" and 70 percent of child-related expenses. (Jan. 17, 2023 Agreed Entry – Trial Stipulations at 2.) The parties agreed that "[t]he only remaining issues to be determined at trial are: 1) non-financial child-related issues and 2) attorney fees, including [Ms. Son]'s Motion for Attorney Fees and [Mr. Mahbub]'s request for attorney's fees and costs pursuant to his Counterclaim." *Id*. at 4.

{¶ 4} The trial commenced on January 26, 2023. Despite only four witnesses, Ms. Son, custody evaluator Ms. Niesen, Mr. Mahbub, and GAL Long, the trial court required 42 days of testimony. Relevant to the instant case, the parties filed an agreed amended temporary order regarding child support on May 1, 2023. On July 2, 2023, the trial court modified temporary custody and designated Mr. Mahbub as the residential parent. The final hearing in this matter concluded on December 8, 2023.

{¶ 5}    On December 18, 2023, the trial court removed Long as the GAL in the case. A second GAL, Usherala R. Johnson, was appointed on December 20, 2023.  The parties submitted closing briefs on February 23, 2024.  On April 14, 2024, GAL Johnson submitted a "limited scope" report regarding "how the modified temporary orders issued by this Honorable Court on July 2, 2023 has affected [A.M.] and whether in the [GAL]'s professional opinion the modification continues to be in her best interest." (Apr. 14, 2024 Limited Scope GAL Report as to the Interim Orders Modifying Temporary Custody & Determining Residential Parent for School Placement Purposes Pending Decree of Divorce ("Limited Scope Report").)

{¶ 6}    On August 23, 2024, the trial court issued its decision and judgment entry divorce decree.  In relevant part, the trial court designated Mr. Mahbub as sole legal custodian and residential parent for school placement purposes.  The trial court also found that "[Ms. Son] would be the obligor for child support under the new orders contained herein.  [Mr. Mahbub] would be the obligee for child support."  (Aug. 23, 2024 Divorce Decree at 57.)

{¶ 7}    Ms. Son filed a timely appeal on September 20, 2024.

## II. Assignments of Error

{¶ 8}    Ms. Son assigns the following two assignments of error for our review:

[1.] The trial court's award of sole custody to Father is against the manifest weight of the evidence. The decision rests on erroneous factual findings and improper reliance on an inadmissible post-trial report from a stand-in guardian ad litem—someone who did not observe the proceedings, did not testify, and never recommended sole custody to father.

[2.] The trial court erred and abused its discretion by vacating the agreed entry filed January 17, 2023 selectively violating the parties' stipulations, and in determining that appellant must pay child support to appellee.

(Capitalization normalized.)

## III. Analysis

### A.  Ms. Son's First Assignment of Error

{¶ 9}    In Ms. Son's first assignment of error, she argues that the trial court's award of sole custody to the Mr. Mahbub was against the manifest weight of the evidence.

## B. Standard of Review

{¶ 10} While the trial court must follow R.C. 3109.04 when resolving child custody matters, it has broad discretion when deciding what is the appropriate allocation of parental rights and responsibilities. *Pallone v. Pallone*, 2017-Ohio-9324, ¶ 36 (10th Dist.), citing *Parker v. Parker*, 2006-Ohio-4110, ¶ 23 (10th Dist.). A reviewing court must afford a trial court's child custody determination the utmost respect. *Pallone* at ¶ 36, citing *Pater v. Pater*, 63 Ohio St.3d 393, 396 (1992). "This deference is given based on the nature of the proceeding, the impact the court's determination will have on the lives of the parties concerned, and the fact that the knowledge a trial court gains through observing the witnesses and the parties in a custody proceeding cannot be conveyed to a reviewing court by a printed record." (Further citation omitted.) *Pallone* at ¶ 36, citing *H.R. v. L.R.*, 2009-Ohio-1665, ¶ 13 (10th Dist.). Indeed, "[c]ustody determinations are some of the most difficult and agonizing decisions a trial judge must make, and, therefore, appellate courts must grant wide latitude to a trial court consideration of the evidence." (Internal quotation marks deleted and citation omitted.) *Gupta v. Sharan*, 2022-Ohio-4479, ¶ 69 (10th Dist.).

{¶ 11} We generally review a trial court's decision concerning child custody for an abuse of discretion. *C.T.F. v. A.B.M.*, 2025-Ohio-1036, ¶ 10-11 (10th Dist.), citing *Taylor v. Taylor*, 2018-Ohio-2530, ¶ 5 (10th Dist.), citing *Booth v. Booth*, 44 Ohio St.3d 142, 144 (1989); *Wireman v. Wireman*, 2023-Ohio-3007, ¶ 19 (3d Dist.), citing *Davis v. Flickinger*, 1997-Ohio-260 ("An appellate court reviews a domestic relations court's decision regarding parental rights for an abuse of discretion."). An "abuse of discretion" implies that the trial court's determination was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶ 12} The Supreme Court of Ohio has held that when an appellate court finds that the trial court has abused its discretion in a child custody determination, it must reverse and remand the matter for further proceedings. *Miller v. Miller*, 37 Ohio St.3d 71 (1988). In *Miller*, the trial court, heavily relying on a referee's report, granted custody of the two minor children to the husband. *Id.* at 73. The appellate court reversed the trial court finding that the referee's report was "offensive, sexist and overstepped the bounds of propriety." *Id.* Having found the trial court abused its discretion, the appellate court awarded custody of the minor children to the mother. The Supreme Court reversed the

appellate court concluding that while the trial court abused its discretion in relying on the report, the appellate court erred by failing to remand the matter back to the trial court for further proceedings. *Id.* at 74. The *Miller* court explained that, under the facts of the case, the appellate court's determination that the trial court abused its discretion was insufficient to allow it to independently weigh the evidence and grant a change of custody. *Id.*

{¶ 13} Here, Ms. Son asks this court to go beyond the standard abuse of discretion review and award her sole custody of A.M. under App.R. 12(C)(1). App.R. 12(C)(1) provides that:

> In any civil action or proceeding that was tried to the trial court without the intervention of a jury, and when upon appeal a majority of the judges hearing the appeal find that the judgment or final order rendered by the trial court is against the manifest weight of the evidence and have not found any other prejudicial error of the trial court in any of the particulars assigned and argued in the appellant's brief, and have not found that the appellee is entitled to judgment or final order as a matter of law, the court of appeals shall reverse the judgment or final order of the trial court and either weigh the evidence in the record and render the judgment or final order that the trial court should have rendered on that evidence or remand the case to the trial court for further proceedings.

{¶ 14} While the Supreme Court rejected the mother's App.R. 12 argument in *Miller*, it left the door open for its future application under different circumstances. "While App. R. 12 grants an appellate court the power to reverse trial court judgments and enter those judgments that the court should have rendered, we agree with the dissenting appellate judge below that it is inappropriate in *most cases* for a court of appeals to independently weigh evidence and grant a change of custody." (Emphasis added.) *Miller* at 74. While *Miller* directs that an appellate court may not reverse and render the judgment that the trial court should have rendered when there is merely an abuse of discretion, it may do so, pursuant to App.R. 12(C), when the trial court's judgment is against the manifest weight of the evidence.

{¶ 15} When an appellate court is reviewing whether the judgment is against the manifest weight of the evidence, it "must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way." *In re Z.C.*, 2023-Ohio-4703, ¶ 14, citing *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20. When weighing the evidence, a reviewing court

must be mindful of the presumption in favor of the finder of fact. *Id.*, citing *Eastley* at ¶ 21. "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.*" Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). "Weight of the evidence concerns 'the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. . . . Weight is not a question of mathematics, but depends on [the evidence's] effect in inducing belief.' " (Further quotation marks deleted and citation omitted.) *T.H. v. N.H.*, 2021-Ohio-217, ¶ 48 (10th Dist.), quoting *Eastley* at ¶ 12. " 'The phrase "some competent, credible evidence" . . . presupposes evidentiary weighing by an appellate court to determine whether the evidence is competent and credible.' " *Id.*, quoting *Eastley* ¶ 15.

### C. Available Evidence

{¶ 16} In addition to the numerous exhibits admitted during the trial, four witnesses—Mr. Mahbub, Ms. Son, GAL Long, and Ms. Niesen—provided testimony in this case. After the conclusion of the trial, the trial court considered and incorporated GAL Johnson's limited report in its final decision. Given the unique facts of this matter, we must define the scope of our available evidence before reviewing the trial court's best-interest analysis.

### 1. GAL Long's Testimony and Report

{¶ 17} The trial court's combative dealings with GAL Long overshadowed much of these proceedings. A brief review of the procedural history of this conflict is instructive.

{¶ 18} GAL Long was appointed in this matter on June 2, 2020. A report and recommendation was filed on January 19, 2023. On January 24, 2023, the parties filed an agreed entry releasing GAL Long's report and recommendation. In the report, GAL Long recommended sole custody to Ms. Son with a requirement that she seek input from Mr. Mahbub prior to making any major decisions for A.M. (Jan. 19, 2023 Report & Recommendation at 22.) On July 2, 2023, the trial court modified the temporary orders awarding both parents temporary custody and designating Mr. Mahbub as the temporary residential parent for school placement purposes. The trial court acknowledged that the modification "flipped [A.M.'s] schedule upside down." (Sept. 15, 2023 Tr. Vol. 39 at 7309.)

While Ms. Son filed an appeal of the July 2, 2023 modification to temporary custody, we granted Mr. Mahbub's motion to dismiss the appeal as it was not a final, appealable order. *See Mahbub v. Mahbub*, 10th Dist. No. 23AP-456 (Sept. 20, 2023 Journal Entry).[1]

{¶ 19} During the course of the trial, the dynamic between GAL Long and the trial court deteriorated. Most notably, the trial court, after a brief exchange as to why GAL Long had not updated her report, threatened to hold her in contempt. (Tr. at 7311-7312.)[2] On September 19, 2023, GAL Long filed an interim report maintaining her prior recommendation that Ms. Son have sole custody with a requirement that she seek input from Mr. Mahbub prior to making any major decisions for A.M. (Sept. 19, 2023 Interim Report & Recommendation at 12.) The final day of trial testimony concluded on September 15, 2023. The parties reconvened on September 25, 2023 regarding the admission of exhibits. Also on September 25, 2023, Mr. Mahbub filed a motion to modify temporary orders, a motion to remove GAL Long, and a motion to strike GAL Long's September 19, 2023 interim report and recommendation.

{¶ 20} On September 27, 2023, Ms. Son's counsel filed an affidavit of disqualification with the Supreme Court. *In re Disqualification of Hon. George Leach*, 23-AP-152 (Dec. 1, 2023 Jgmt. Entry & Decision). On October 31, 2023, GAL Long also filed an affidavit of disqualification with the Supreme Court. *Mahbub v. Mahbub (In re Leach)*, 2023-Ohio-4776. On December 1, 2023, the Supreme Court dismissed GAL Long's affidavit for lack of standing. *Id.* The Supreme Court denied Ms. Son's affidavit of disqualification on December 4, 2023.

{¶ 21} On December 8, 2023, the trial court held a hearing regarding GAL Long's interim report and recommendation as well as the pending motion to remove her as GAL. On December 11, 2023, the trial court denied the motion to strike GAL Long's September 19, 2023 interim report and recommendation. The trial court, however, granted Mr. Mahbub's motion to remove GAL Long on December 18, 2023. On December 20, 2023, the trial court appointed Usherala R. Johnson as the new GAL in this case.

---

[1] Ms. Son also filed a notice of appeal from an August 16, 2023 decision, which she later voluntarily dismissed. (Oct. 19, 2023 Entry.)

[2] To be sure, there were additional tense dealings between GAL Long and the trial court. In the interest of brevity, however, we will focus on the most relevant to these proceedings.

{¶ 22} On April 14, 2024, GAL Johnson provided a report titled, "LIMITED SCOPE GUARDIAN AD LITEM REPORT AS TO THE INTERIM ORDERS MODIFYING TEMPORARY C[]USTODY AND DETERMINING RESIDENT[]IAL PARENT FOR SCHOOL PLACEMENT PURPOSES PENDING DECREE OF DIVORCE." GAL Johnson defined the scope of her report as for the "limited purpose to investigate how the modified temporary orders issued by this Honorable Court on July 2, 2023 has affected [A.M.] and whether in the G.A.L.'s professional opinion the modification continues to be in her best interest." (Apr. 14, 2023 Limited Scope Report at 1.) GAL Johnson, after reviewing the relevant filings and cited interviews, concluded that the temporary orders should be maintained with slight alterations to the parenting time for Ms. Son. *Id.* at 3. Neither party filed an objection or motion in response to GAL Johnson's report.

{¶ 23} As an initial matter, we have no authority to address claims that the trial court was biased as "[t]he Supreme Court has the exclusive jurisdiction to address claims of bias or violations of rules of judicial conduct." *State v. Byers*, 2025-Ohio-1511, ¶ 50 (10th Dist.), citing *State v. Bastawros*, 2024-Ohio-2809, ¶ 21 (8th Dist.). In fact, the Supreme Court has already reviewed the matter and declined to disqualify the trial court judge in this case. Furthermore, the trial court's determination to remove GAL Long is not before us on appeal. Whether we agree with the decision is immaterial.

{¶ 24} Returning to GAL Long's testimony and report, while the trial court removed GAL Long from the case, it denied Mr. Mahbub's request to strike her final report. The trial court's utilization of GAL Long's report, after determining she had a conflict, is puzzling to say the least. It is impossible to reconcile how the trial court could determine GAL Long "operated throughout her appointment as though she was a 'party' to the action and did not act in a manner to assist this Court," then repeatedly cite her report throughout its decision. (Divorce Decree at 45.) Thus, while GAL Long's testimony and report are in the record and available evidence, it is difficult to give it much weight, if any, as the trial court has plainly found her analysis in this case not credible. Given the conflicting evidence, we must defer to the trial court's credibility determination.

### 2. GAL Johnson's Report

{¶ 25} Next, we must consider the trial court's utilization of GAL Johnson's report in its decision. In its final decision and judgment entry, the trial court repeatedly cited to

GAL Johnson's limited report and applied it to the final custody determination. The trial court's utilization of this limited-scope report is problematic in several ways. First, GAL Johnson was appointed after the trial concluded. It is well settled that "[i]n rendering judgment after a bench trial, a trial court considers the evidence adduced from the witness stand, the exhibits admitted during trial, and stipulations." *Kidane v. Gezahegn*, 2015-Ohio-2662, ¶ 20 (10th Dist.), citing *Midstate Educators Credit Union, Inc. v. Werner*, 2008-Ohio-641, ¶ 35 (10th Dist.). Stated another way, when reaching a decision following trial, " 'the trial court may only consider the evidence . . . admitted at trial.' " *Bonn v. Bonn*, 2015-Ohio-3642, ¶ 27 (10th Dist.), quoting *Hoaglin Holdings, Ltd. v. Goliath Mtge., Inc.*, 2004-Ohio-3473, ¶ 15 (8th Dist.). Other evidence in the record but not admitted at trial should not be considered. *Hoaglin Holdings, Ltd.* at ¶ 15.

{¶ 26} Mr. Mahbub contends that Ms. Son waived contesting the trial court's utilization of GAL Johnson's report as she never objected to the report, moved to strike the report, or attempted to reopen the trial to cross-examine GAL Johnson. (Appellee's Brief at 25-26.) We find this argument without merit. While it seems obvious, it is worth underscoring the point—GAL Johnson never participated in the trial. GAL Johnson's report was expressly for the "limited purpose to investigate how the modified temporary orders . . . affected [A.M.] and whether . . . the modification continues to be in her best interest." (Apr. 14, 2024 Limited Scope Report.) Given the trial concluded well before the report was published, as well as the limited nature of the report, it is not reasonable for Ms. Son to have anticipated that the trial court would utilize it in its final judgment entry.

{¶ 27} Mr. Mahbub also argues the trial court stated it reviewed the "entire file to date" and that even if it was error to admit GAL Johnson's report, the error was harmless. (Appellee's Brief at 20, 29.) We disagree. The trial court repeatedly relied on GAL Johnson's limited report in its determination of custody and incorporated it consistently throughout the decision. By way of example, when considering the wishes of A.M., the trial court, despite not conducting an interview of the child in chambers, cited GAL Johnson's report as part of its analysis. "When the child spoke to the former Guardian ad Litem, the child seemed to like the living arrangement existing at that time." (Divorce Decree at 30.) GAL Johnson's report is even cited regarding factors she did not consider in her limited report. *See, e.g.*, "[t]he present Guardian ad Litem did not weigh in on this issue

specifically. However, she recommended that this Court's July 2, 2023 Interim Order be maintained," *id.* at 42; "[t]he current Guardian ad Litem did not weigh in on this issue but remarked how well the child was doing at school and at each parent's home," *id.*; "[t]he current Guardian ad Litem did not specifically make a recommendation on this topic [of counseling], but she agreed and stated that this Court's July 2, 2023, Interim Order be maintained." *Id.* at 43.

{¶ 28} Mr. Mahbub next argues that GAL Johnson was properly appointed as the GAL, and there is no language in the entry that limits or restricts her responsibilities. We agree, and the trial court's desire to have GAL Johnson provide a recommendation as to the temporary order is not, in and of itself, problematic. The issue is the trial court's reliance on the limited report as evidence for a trial that had already taken place.

{¶ 29} Mr. Mahbub notes, "the original Guardian's testimony and Reports, despite her subsequent removal, remained as evidence and were explicitly considered throughout the Trial Court's final decision. . . . The same is true of the new Guardian, whose Report *was* considered as evidence." (Emphasis in original.) (Appellee's Brief at 24.) As set forth previously, GAL Long's report provides little evidentiary value as the trial court determined that she displayed a bias against one of the parties. GAL Johnson's report is problematic in its own right as it was filed after the trial and was never admitted into evidence. Even looking at GAL Johnson's report, its evidentiary value is quite minimal as it only addressed the temporary orders. Thus, while through no fault of GAL Johnson, the utilization of the limited report as part of the final decree was plainly erroneous. *Cugini & Capoccia Builders, Inc. v. Ciminello's, Inc.*, 2003-Ohio-2059, ¶ 21 (10th Dist.) (finding that the trial court erred by relying on evidence not admitted at trial, or evidence deemed inadmissible, to find that plaintiff was entitled to certain damages).

{¶ 30} Mr. Mahbub argues that even if GAL Johnson's report was not properly admitted, a court may take judicial notice of the report. (Appellee's Brief at 31.)[3] We also find this argument unavailing. A court may take judicial notice of adjudicative facts at any stage of the proceedings, including on appeal. *Robol v. Columbus*, 2025-Ohio-973, ¶ 73 (10th Dist.), citing *State v. Murphy*, 2013-Ohio-5599, ¶ 23 (10th Dist.), citing Evid.R. 201.

---

[3] Mr. Mahbub also contends that the trial court could have taken judicial notice of GAL Johnson's report. However, there is no indication in the record or the trial court's decision that it acted in this manner.

"A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Evid.R. 201(B). Here, we decline to take judicial notice of GAL Johnson's report as it contains statements subject to dispute and would introduce new facts not presented at the trial. Regardless, even if the report was not subject to reasonable dispute, given the low probative value of such a limited report, and no opportunity for the parties to examine GAL Johnson regarding her conclusions, we find it inappropriate to do so under such circumstances. Because GAL Johnson's report was never admitted as evidence at trial, we cannot consider it in our best-interest analysis.

### 3. Custody Evaluator

{¶ 31} Ms. Niesen was appointed as the custodial evaluator on March 2, 2021. Ms. Niesen submitted her initial report and recommendation on November 15, 2021. An updated report was filed on May 17, 2022. (Pl.'s Ex. 70.) While Ms. Niesen initially recommended shared decision making for the parties, she changed her recommendation in her second report to sole custody to Ms. Son. Niesen also testified at trial as to the nature of her reports and recommendation.

{¶ 32} In its August 23, 2024 decision, the trial court found that "portions of [the] custody evaluator's recommendation in her initial filing of November 15, 2021, were supported by trial exhibits offered and admitted, as well as the testimony of parties and witnesses. The Court further finds her first recommendation to be more reliable than her second updated opinion . . . and her in-court testimony." (Divorce Decree at 45.) The trial court goes on to explain that it takes issue with Ms. Niesen's methodology and that "the former Guardian ad Litem held a bias that unduly influenced the Custody Evaluator against Defendant in the updated Custody Evaluator's report and recommendation." *Id.* at 47.

{¶ 33} As what has become a theme, the trial court's reasoning is difficult to square with the rest of its decision. First, while the trial court appears to discredit Ms. Niesen as she was "unduly influenced" by GAL Long, it did not remove her from the proceeding. *Id.* Instead, the trial court elected to use aspects of Ms. Niesen's first report and recommendation in its decision. While the trial court takes issue with Ms. Niesen changing her recommendation from shared parenting to sole custody to Ms. Son, it also concluded,

based on trial testimony and the parties' recommendations, that shared parenting was not possible. Furthermore, while the trial court goes on to question Ms. Niesen's methodology in her first report, it somehow found the first report more reliable than her trial testimony and updated report. This is despite the trial court emphasizing the need for a second report after Ms. Niesen deemed her first report "invalid." Regardless of the inherent contradictions in the trial court's decision, at base, the trial court deemed Ms. Niesen's evaluation lacked credibility. "This Court finds the opinions and scientific conclusions expressed and testified to by Ms. Niesen to be unreliable in large part. This is evidenced by Ms. Niesen's own testimony in that she did not maintain her 'objectivity' while performing her duties as required by this Court and her profession." *Id.* at 47-48. Again, given these contradictions in the evidence, we must defer to the trial court's interpretation on Ms. Niesen's testimony and give it little weight in our best-interest determination.

### D. Best-Interest Factors

{¶ 34} A juvenile court's resolution of legal custody must be based on the best interest of the child. *In re D.K.*, 2023-Ohio-4148, ¶ 41 (1st Dist.), citing *In re Allah*, 2005-Ohio-1182, ¶ 10 (1st Dist.). "R.C. 3109.04 governs the allocation of parental rights and responsibilities and sets forth the procedures and standards courts are to use in proceedings pertaining to such matters." *Gupta v. Sharan*, 2022-Ohio-4479, at ¶ 68 (10th Dist.), citing *In re A.G.*, 2014-Ohio-2597, ¶ 41. R.C. 3109.04(B)(1) requires the trial court to consider the best interest of the child when allocating parental rights and responsibilities. *Id.* The trial court must consider all relevant factors related to the child's best interest, including but not limited to, those specified in R.C. 3109.04(F)(1)(a) through (j). *Gupta* at ¶ 68, citing *Rankin v. Rankin*, 2021-Ohio-1967, ¶ 28 (10th Dist.).

{¶ 35} R.C. 3109.04(F)(1) provides as follows:

> In determining the best interest of a child pursuant to this section, whether on an original decree allocating parental rights and responsibilities for the care of children or a modification of a decree allocating those rights and responsibilities, the court shall consider all relevant factors, including, but not limited to:
>
> (a) The wishes of the child's parents regarding the child's care;
>
> (b) If the court has interviewed the child in chambers pursuant to division (B) of this section regarding the child's wishes and concerns as to the allocation

of parental rights and responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court;

(c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;

(d) The child's adjustment to the child's home, school, and community;

(e) The mental and physical health of all persons involved in the situation;

(f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;

(g) Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor;

(h) Whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; whether either parent, in a case in which a child has been adjudicated an abused child or a neglected child, previously has been determined to be the perpetrator of the abusive or neglectful act that is the basis of an adjudication; whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to a violation of section 2919.25 of the Revised Code or a sexually oriented offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding; whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding and caused physical harm to the victim in the commission of the offense; and whether there is reason to believe that either parent has acted in a manner resulting in a child being an abused child or a neglected child;

(i) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;

(j) Whether either parent has established a residence, or is planning to establish a residence, outside this state.

{¶ 36} Moreover, when resolving whether shared parenting is in the best interest of the child, the trial court must consider the statutory factors, but is not limited to, under R.C. 3109.04(F)(2), which provides:

(a) The ability of the parents to cooperate and make decisions jointly, with respect to the children;

(b) The ability of each parent to encourage the sharing of love, affection, and contact between the child and the other parent;

(c) Any history of, or potential for, child abuse, spouse abuse, other domestic violence, or parental kidnapping by either parent;

(d) The geographic proximity of the parents to each other, as the proximity relates to the practical considerations of shared parenting;

(e) The recommendation of the guardian ad litem of the child, if the child has a guardian ad litem.

{¶ 37} Finally, R.C. 3109.04(F)(3) directs that, "[w]hen allocating parental rights and responsibilities for the care of children, the court shall not give preference to a parent because of that parent's financial status or condition."

### 1. Wishes of the Child's Parents Regarding Childcare (R.C. 3109.04(F)(1)(a))[4]

{¶ 38} The trial court found that both parents sought sole custody. (Divorce Decree at 26.) Upon review, we agree with the trial court's determination in this regard. It is apparent from the record that both Mr. Mahbub and Ms. Son desired sole custody. While Mr. Mahbub filed a January 21 and December 22, 2022 proposed shared parenting plan, he withdrew those proposed plans on August 25, 2023. During the trial, Mr. Mahbub testified that he wished to have sole custody of A.M. As for Ms. Son, while the trial court was incorrect stating that "[Ms. Son] has never requested shared parenting and sought sole legal custody," *see* divorce decree at 25, as her complaint plainly states otherwise, Ms. Son also testified that she desired sole custody and did not believe she could co-parent with Mr. Mahbub. Ms. Son succinctly summarized both party's positions on shared parenting in her closing arguments writing, "[b]y the end of trial, neither party requested shared parenting." (Feb. 23, 2024 Written Closing Argument of Pl. at 2.) Based on the evidence in the record, we agree with the trial court that the parties do not wish, or could successfully maintain, shared parenting.

---

[4] While the trial court addressed claims of domestic violence under this factor, we find it more appropriate under the mental and physical health prong in Section 3.

**2. The Child's Interaction and Relationship with the Parents (R.C. 3109.04(F)(1)(c)) and The Child's Adjustment to the Child's Home, School, and Community (R.C. 3109.04(F)(1)(d))**

{¶ 39} The trial court found, despite the interpersonal conflict between the parties, that A.M. has a good relationship with both Ms. Son and Mr. Mahbub. There was extensive testimony that both parents spend time and engage in activities with A.M. Similarly, the trial court found that A.M. has adjusted well to both homes, school, and communities. We agree. Despite the contentious relationship of the parents, A.M. has consistently adapted well to her change in environment. There is no dispute that A.M.'s resilience throughout the life of this case is inspiring.

**3. The Mental and Physical Health of All Persons Involved in the Situation (R.C. 3109.04(F)(1)(e))**

**a. Physical and Mental Health**

{¶ 40} The trial court concluded, and the parties agree, that all persons involved are in good physical health. Regarding mental health, the trial court concluded that "both parents struggled with an alcohol and/or drug addiction and/or abuse during the marriage." (Divorce Decree at 33.) Upon review, while mindful of the presumption in favor of the finder of fact, the conclusion that both parties suffered from addiction or abuse during the marriage creates a false equivalency between the parties.

{¶ 41} Ms. Son testified extensively regarding Mr. Mahbub's mental health as well as prescription and alcohol abuse. Ms. Son noted that in the evening, Mr. Mahbub would come home and "immediately make a drink, if he hadn't called me to tell me to make him a drink on the way home." (Jan. 30, 2023 Tr. Vol. 2 at 78.) Ms. Son testified that Mr. Mahbub "would just drink and drink and drink and yell and yell . . ." (Tr. at 79.) According to Ms. Son, Mr. Mahbub would continue drinking and insult her cooking as "garbage." (Tr. at 79.) Mr. Mahbub would then take Xanax and drink alcohol in front of the television. (Tr. at 80.) Mr. Mahbub would require Ms. Son to give him a massage, or she was "going to pay the consequences." (Tr. at 81.)

{¶ 42} The trial court concluded that Mr. Mahbub had addressed his alcohol addiction based on his substantial compliance with alcohol testing under Soberlink. (Divorce Decree at 34.) This is contradicted by the evidence as Mr. Mahbub admitted to at least three drinking relapses during the life of the case. It was only after these relapses that

Mr. Mahbub agreed to utilize Soberlink. Moreover, as acknowledged by the trial court, Mr. Mahbub has failed to attend counseling at the frequency recommended. *Id*. at 34.

{¶ 43} In addition to alcohol abuse, Mr. Mahbub's efforts to control, and general behavior towards, Ms. Son was problematic to say the least. If Ms. Son did not respond to Mr. Mahbub's messages, he would turn off her phone, remove money from their joint bank account, or "whatever other consequence he would deem appropriate." (Tr. at 122.) Mr. Mahbub also controlled Ms. Son's communication through deleting her messages, which required Ms. Son to forward text messages to her sister while hiding in the bathroom. (Tr. at 69-70.) "I knew that I needed to keep a record, because I knew that he would make me delete them." (Tr. at 69.) Ms. Son noted regarding these episodes that "[o]nce the cycle was triggered, it would be two to three days, once or twice a week," and lasted for years. (Tr. at 106.)

{¶ 44} The text message evidence mirrored much of Ms. Son's testimony. Ms. Son introduced troubling text messages of Mr. Mahbub cursing over minor grievances, demands for explicit sexual acts, and graphic messages invoking suicide. In one exchange, Mr. Mahbub threatened Ms. Son's family, the Starks, writing that they would "meet[] their fate - whether it's through me or you." (Pl.'s Ex. 16 at 145.) Mr. Mahbub also wrote that Ms. Son "deserve[d] to burn in hell for [her] sins." *Id*. at 144. In another text message, Mr. Mahbub wrote:

> If you show up tomorrow to be "here for me" it's going to be a god damn shit show, and I'll make sure this entire neighborhood knows the real Jackie and Kathy Starks.
>
> You called me to get a rise out of me, now you have it
>
> You and your mom make people want to kill them selves
>
> Are you happy now?
>
> I want to shoot my fucking brains out because of the way you have made me feel, the confidence you have stripped from me, and the life you have forced us to have

(Sic passim.) (Pl.'s Ex. 12 at 93.)

{¶ 45} Indeed, Ms. Son has had mental health struggles in the past. According to Ms. Son, around 2009 or 2010, she began experiencing anxiety after she became engaged to Mr. Mahbub. (Jan. 30, 2023 Tr. Vol. 2 at 122-123.) In 2012, Ms. Son was hospitalized

for a panic attack after she "upset [Mr. Mahbub]." (Tr. at 123, 126.) Ms. Son was taking alprazolam, the generic of Xanax, at the time. (Tr. at 127.) Ms. Son testified that she overdosed on her medication in 2012. (Tr. at 128-129.) "I was not trying to kill myself, no. I was trying to make the abuse stop, and I was trying to get [Mr. Mahbub] to see how much he was hurting me so he would stop." (Tr. at 129.) Ms. Son had another overdose in 2015. Ms. Son attributed the second overdose to the "several-day cycle of abuse" by Mr. Mahbub. (Tr. at 131-132.) Between December 2015 to the March 2020 incident, Ms. Son did not have a prescription for Xanax. (Tr. at 138.) Ms. Son testified that she has not had any other suicide attempts since that time. (Tr. at 135.)

{¶ 46} We must consider these incidents in the context of the best-interest analysis. While both parents have had similar mental health struggles, the recency of Mr. Mabub's behavior and mental health concerns, most notably in the March 2020 incident described in the subsequent section, present a far more concerning pattern. Ms. Son's struggles predated the birth of A.M. and occurred nearly a decade before the trial in this case. Given the recency of Mr. Mahbub's mental health struggles, text message evidence, and relapses with alcohol, we believe Mr. Mahbub's issues present a far greater concern when considering the best interest of the child.

### b. Domestic Violence

{¶ 47} Next, we must address Ms. Son's repeated claims of domestic violence and abuse. As a threshold issue, Mr. Mahbub argues that the domestic violence analysis is not required under R.C. 3109.04(F)(1). (Appellee's Brief at 41.) We find this point unavailing as the trial court, in fact, made a finding that no domestic violence took place. (Divorce Decree at 28.) Regardless, while Mr. Mahbub is correct that domestic violence is not an express factor under R.C. 3109.04(F)(1), the statute allows a court to consider additional factors in its best-interest analysis. As such, allegations of domestic violence and abuse in any form are probative as to concerns over mental health and the ultimate custody determination.

{¶ 48} As for the allegations of domestic violence, the trial court found that "no evidence was presented in this matter under either Ex Parte Civil Protection Orders that Defendant committed domestic violence or assaulted his wife and/or child." (Divorce

Decree at 28.) The trial court's conclusion strains credulity as the evidence in the record plainly reveals otherwise.

{¶ 49} On March 25, 2020, Mr. Mahbub sent the following text message to Ms. Son:

Tomorrow, you get to watch me ruin someone's life that you love dearly - like you've ruined mine. Maybe it will then put it into perspective for you

Everyday will be wors[e] than the last, I swear on it all - without sleep, tomorrow you will wish that you would rather have corona virus or would be mourning the loss of a loved one

(Sic passim.) (Pl.'s Ex. 16 at 147.)

{¶ 50} Ms. Son interpreted the text message as "a threat to [her] safety and [her] family's safety." (Jan. 30, 2023 Tr. Vol. 2 at 151.) On March 26, 2020, Mr. Mahbub texted Ms. Son to come downstairs. (Tr. at 153.) When Ms. Son came downstairs, Mr. Mahbub was sitting on the couch "with a very large knife." (Tr. at 153.) When Mr. Mahbub refused to respond to her inquires, Ms. Son called the police. (Tr. at 153.)

{¶ 51} During the 911 call, Ms. Son informed the dispatcher that Mr. Mahbub had a knife, had been drinking, and was upset. (Pl.'s Ex. 17 at 0:20.) Ms. Son remarked, "[w]e have a daughter that is sleeping and I don't know what to do." *Id.* at 0:22. In the background, Mr. Mahbub stated, "I want you out of my house." *Id.* at 1:48. When the dispatcher asked whether Mr. Mahbub had violent tendencies, Ms. Son replied "yes" but stated she "can't say right now." *Id.* at 7:25. Ms. Son testified that she was in fear when she made the 911 call. (Tr. at 157.) Law enforcement arrived and transported Mr. Mahbub to Riverside Methodist Hospital for an involuntary medical hold, also referred to as a "pink slip." *Id.* at 159-160, 1656.

{¶ 52} On March 26, 2020, Ms. Son obtained an ex parte civil domestic violence protection order ("CPO"). (Pl.'s Ex. 19.) Ms. Son filed a complaint for divorce on April 14, 2020. On June 3, 2020, Mr. Mahbub was arrested and criminally charged with violating the protection order after he sent 100 roses to Ms. Son. A note was included with the roses, which read, "My love, I cannot imagine a world without you. Always and forever, Shahan." (Tr. at 172.) Ms. Son, based on their prior interactions, felt threatened from the language in the note as Mr. Mahbub knew she did not like roses. (Tr. at 174.) The charges were later dismissed. After several continuances of the final hearing, the CPO was dismissed on August 12, 2020.

{¶ 53} On September 11, 2020, Ms. Son filed a second petition for a CPO and received an ex parte order that same day. Ms. Son alleged that Mr. Mahbub followed her home and contacted her approximately 16 times within an hour by call, text, FaceTime, and Facebook message. (Tr. at 189, 191.) This is despite a prior agreement to utilize Our Family Wizard and limit communication to child-related issues. (Tr. at 183-184.) The parties entered an order of protection by consent in the second matter on June 17, 2021. On November 22, 2022, the trial court terminated the consent order and upon appeal, we affirmed. *J.M. v. S.M.*, 2023-Ohio-4803 (10th Dist.).

{¶ 54} R.C. 3113.31(A)(1)(a)(ii) defines domestic violence to not only include physical harm but also "[p]lacing another person by the threat of force in fear of imminent serious physical harm or committing a violation of section 2903.211 [menacing by stalking] or 2911.211 [aggravated trespass] of the Revised Code[.]" In the civil protection order context, Ohio courts have found that that when determining whether to grant a CPO under R.C. 3113.31, an explicit threat is not required. "Instead, statements, conduct, and actions, taken with all surrounding facts and circumstances, can constitute a threat." *R.E.S. v. M.J.M.*, 2025-Ohio-546, ¶ 17 (8th Dist.), citing *J.S. v. L.S.*, 2022-Ohio-2485 (10th Dist.).

{¶ 55} When addressing the claims of domestic violence in the divorce decree, the trial court first found that the order of protection by consent of the parties "relieves this Court of its duty and ability to hear evidence and make a finding that a Respondent committed acts of domestic violence or presented a Petitioner with an imminent risk of serious physical harm or injury, and/or threats of abuse . . ." (Divorce Decree at 28.) Curiously, the trial court went on to find that domestic violence did not take place. *Id.* In any case, the trial court misunderstands the purpose of a consent order in this context. "The purpose of a CPO issued pursuant to R.C. 3113.31 is to provide a family or household member with protection from domestic violence." *Mansaray v. Sankoh*, 2005-Ohio-1451, ¶ 6 (10th Dist.). The fact that the parties entered into a consent order does not relieve the trial court of its ability to consider domestic violence in its best interest determination. Quite the opposite. We have observed a consent agreement " 'implies domestic violence has occurred.' " *J.M.*, 2023-Ohio-4803, at ¶ 43 (10th Dist.), quoting *J.J. v. Kilgore*, 2021-Ohio-928, ¶ 16 (10th Dist.). Here, while the consent agreement did not include an express

admission, based on the prior testimony, the fact that the parties entered into a consent order provides support for Ms. Son's account.

{¶ 56} Appellee cites our decision regarding the June 17, 2021 consent order for the proposition that Ms. Son could not have been repeatedly placed in fear of imminent serious physical harm. (Appellee's Brief at 42.) Mr. Mahbub misinterprets our decision regarding the consent order. In *J.M.*, Ms. Son appealed from the trial court's November 22, 2022 entry terminating the consent order. On appeal, we found the trial court's decision to terminate the consent order was not an abuse of discretion. "Although appellant testified that she fears appellee, she also admitted that appellee has not caused her any new fear since September 2020." *J.M.* at ¶ 29. While this court found that it was not unreasonable for the trial court to terminate the consent order based on its determination that there was no evidence of a *continued* threat, that is a far cry from Mr. Mahbub's argument that Ms. Son was *never* placed in fear of imminent serious physical harm, or that no domestic violence occurred, in the first instance.

{¶ 57} Based on the evidence at trial, there is no way to view Mr. Mahbub's behavior as anything other than domestic violence. The March 2020 text message followed by the incident involving the knife, is enough to conclude that Mr. Mahbub placed Ms. Son in fear of imminent serious physical harm. Considering the entire body of evidence, most notably Mr. Mahbub's text messages invoking suicide and retribution, we feel even more confident with our conclusion. Arguendo, even if these acts do not reach the level of domestic violence, they are highly probative as to Mr. Mahbub's mental health and our overall determination concerning the best interest of the child. Given Mr. Mahbub's recent struggles with alcohol abuse, suicidal ideations, and domestic violence, this factor is the most telling in our analysis.

### 4. The Parent Most Likely to Honor and Facilitate Court-Approved Parenting Time Rights or Visitation and Companionship Rights (R.C. 3109.04(F)(1)(f))

{¶ 58} The trial court concluded that both parents have consistently had difficulties with facilitating court-approved parenting time, rights, or visitation. Ms. Son pointed to several incidents where Mr. Mahbub did not timely respond, or respond at all, to her Our Family Wizard messages. Moreover, Ms. Son noted that Mr. Mahbub was repeatedly late for pick up or drop off. Conversely, Mr. Mahbub cited examples where Ms. Son failed to

inform him of various activities. We agree with the trial court that both parties have had difficulties on this issue due to, in large part, the deterioration of their relationship. We find this factor does not favor either party.

### 5. Remaining Factors

{¶ 59} The trial court found that factors R.C. 3109.04(F)(1)(b) (in chambers interview), (g) (child support payments), (h) (domestic violence, abuse, or neglect convictions), (i) (denial of shared parenting time), and (j) (out of state residence) were not relevant to the instant case. Upon review, we agree with the trial court that the above factors are not relevant to best-interest analysis in this matter.

### E. App.R. 12(C)

{¶ 60} The Ohio Rules of Appellate Procedure control procedure in appeals from the trial court to the courts of appeals. App.R. 1(A). App.R. 12 governs the manner in which an appellate court may decide a matter on appeal. *State v. Jones*, 2024-Ohio-2719, ¶ 16.

{¶ 61} Given the above best-interest factors, we find the trial court's award of sole custody to Mr. Mahbub was against the manifest weight of the evidence as there was no competent, credible evidence to support such a determination. There are two errors by the trial court that most inform our decision. First, the trial court's repeated utilization of GAL Johnson's report in its final decision. As set forth previously, the trial court erred by relying on the report as it was never admitted as evidence at trial. The second error concerns the trial court's fundamental misunderstanding of domestic violence. Even mindful of the presumption in favor of the finder of fact, as we must under manifest-weight review, the text messages, in conjunction with the 911 audio recording, cannot be ignored. Mr. Mahbub's repeated threats against Ms. Son weigh heavily in our consideration of the best-interest analysis.

{¶ 62} Under App.R. 12(C), if we determine the trial court's final order was against the manifest weight of the evidence, as we have done in this case, we may either remand for further proceeding or "weigh the evidence in the record and render the judgment." Justice Douglas' concurrence in *Miller v. Miller*, 37 Ohio St.3d 71, 75 (1988), is instructive as to the practical realities of remanding this matter back to the trial court stating, "I am at a loss to determine what this court would have the trial judge do upon remand. . . . What further proceedings? The same traumatic parade of hostile venom -- only updated? The same

ultimate finding (custody to appellant) with the exception that the finding be accompanied by a more 'moderate' opinion reciting all the usual domestic relations and psychological contradictions that often are, by necessity, found in such opinions, thereby passing appellate muster?" *See also Ashton v. Ashton*, 1994 Ohio App. LEXIS 2116, *19 (6th Dist. May 20, 1994) (granting, pursuant to App.R. 12(C), appellant's motion for a change of custody as "a remand in this cause would be meaningless. The trial court had all of the facts necessary [for] a determination of custody before it.")

{¶ 63} While the factual claims in *Miller* are distinct from the instant case, we are persuaded that any remand for further proceedings under App.R. 12(C) must have a real purpose. To be sure, we are aware that reversing the judgment of the trial court and rendering judgment, without allowing the trial court to conduct further proceedings, is an unusual and serious remedy reserved only for the rarest of circumstances. We believe this case falls under this limited category. The trial court has already made it clear it believes that Mr. Mahbub should have sole custody. Not only do we find there is no competent, credible evidence to support such a conclusion, but we also cannot overlook the trial court's mismanagement of these proceedings that has led to extensive delays in this case. Given the protracted nature of this matter—42 days of testimony, over the course of one year, for four witnesses—we have little confidence that the trial court can resolve this case in a timely manner. The parents deserve a resolution. A.M. deserves a resolution.

{¶ 64} Accordingly, we sustain Ms. Son's first assignment of error. We award sole custody and residential parent for school placement purposes to Ms. Son. A.M. shall be placed in Ms. Son's custody forthwith. Any forthcoming exchanges shall take place at a police station or location mutually agreed upon by the parties. Mr. Mahbub shall have visitation consistent with Local Rule 27.1, Option C. We remand this matter to the trial court for the limited purpose of aligning any outstanding issues in the divorce decree to comport with the judgment of this court.

### F. Ms. Son's Second Assignment of Error

{¶ 65} In Ms. Son's second assignment of error, she contends that the trial court erred by denying her child support consistent with the agreed entry of the parties.

{¶ 66} We review the trial court's child support determination for an abuse of discretion. *Pallone*, 2017-Ohio-9324, at ¶ 10 (10th Dist.).

{¶ 67} Prior to trial, the parties filed a separation agreement on January 10, 2023. The trial court issued an agreed entry consistent with the trial stipulations proposed by the parties that required, in relevant part, Mr. Mahbub to provide guideline child support. The trial court adopted the agreed entry. In its August 23, 2024 decision, the trial court found that "if [Mr. Mahbub] was obligor and [Ms. Son] was obligee, [Mr. Mahbub's] guideline child support would be one thousand, six hundred and eighty-four dollars and ninety-four cents ($1,684.94), plus the processing fee, for a total of one thousand, seven hundred and eighteen dollars and sixty-four cents ($1,718.64)." (Divorce Decree at 58.) The trial court, however, reasoned that because in the new orders Mr. Mahbub would have sole custody, Ms. Son would be the obligor for child support purposes. *Id.* at 57.

{¶ 68} Ms. Son contends that the trial court is bound by the prior stipulations of the parties. (Appellant's Brief at 41-43.) Conversely, Mr. Mahbub contends that the child support argument was waived, or, in the alternative, Ms. Son invited the error as she sought modification of the parties' stipulated child support allocation in her motion to modify temporary orders and in her closing argument. (Appellee's Brief at 51.)

{¶ 69} A stipulation is a voluntary agreement between the parties to avoid the necessity for proof of an issue. *Havens v. Havens*, 2012-Ohio-2867, ¶ 21 (10th Dist.), citing *In re J.B.*, 2011-Ohio-3658, ¶ 8 (10th Dist.), citing *Julian v. Creekside Health Ctr.*, 2004-Ohio-3197, ¶ 54 (7th Dist.). "Once entered into by the parties and accepted by the court, a stipulation is binding upon the parties." *Id.* If the parties had comported themselves consistent with their stipulation, the prior agreement would control and that would likely be the end of the analysis. However, during the trial, both parties sought to modify the agreed-upon figure for child support. Ms. Son sought to have the child support order modified as evidenced by her motion to modify temporary orders and closing arguments. "Although child support was initially not a matter to be addressed by the Court (see Agreed Entry -- Trial Stipulations stating that only issues remaining for trial were non-financial child-related matters and attorney fees), child support was addressed for purposes of requests to modify temporary orders. . . . Plaintiff requests that the Court consider child support portion of her October 4, 2023 Motion for purposes of child support in the Decree of Divorce." (Feb. 23, 2024 Written Closing Argument of Pl. at 14.) Similarly, Mr. Mahbub raised objections as to his continued obligation to pay child support to Ms. Son during the

trial and in various motions, *see* September 25, 2023 motion to modify temporary orders and December 18, 2023 affidavit in support of motion to modify temporary orders.

{¶ 70} Pursuant to the invited-error doctrine, " '[a] party will not be permitted to take advantage of an error which he himself invited or induced.' " *Tchankpa v. Ascena Retail Group, Inc.*, 2020-Ohio-3291, ¶ 22 (10th Dist.), quoting *Hal Artz Lincoln-Mercury, Inc. v. Ford Motor Co.*, 28 Ohio St.3d 20 (1986). Here, both parties sought modification of the child support stipulation during the trial. As such, Ms. Son cannot argue on appeal that the trial court was bound by the stipulation when it sought to have it modified at various points in the proceeding. Similarly, Mr. Mahbub cannot claim the issue was waived as he too sought modification of the prior stipulation. Thus, we must consider whether the trial court abused its discretion awarding no child support to Ms. Son.

{¶ 71} Given our determination that the trial court's designation of Mr. Mahbub as the sole legal custodian and residential parent was against the manifest weight of the evidence, we find the trial court's determination that Ms. Son was the obligor, and therefore not entitled to child support, must also be reversed. Upon review and consideration of the guideline child support submitted by the parties, we agree with the trial court's calculation that if Ms. Son were the obligee she would be entitled to $1,684.94, plus the processing fee, per month. On remand, the trial court is instructed to align the child support figure to comport with the judgment of this court.

{¶ 72} Ms. Son's second assignment of error is sustained.

## IV. Conclusion

{¶ 73} Having sustained Ms. Son's first assignment of error, pursuant to App.R. 12(C), we render judgment and award Ms. Son sole custody and residential parent for school placement purposes. A.M. shall be placed in Ms. Son's custody forthwith. Any forthcoming exchanges shall take place at a police station or location mutually agreed upon by the parties.

{¶ 74} With respect to Ms. Son's second assignment of error, we reverse and remand this matter with instructions consistent with this decision.

*Judgment reversed;*
*cause remanded.*

LELAND and DINGUS, JJ., concur.

_____